**PUEBLO WEST METROPOLITAN DISTRICT, Applicant-Appellant,**

**v.**

**SOUTHEASTERN COLORADO WATER CONSERVANCY DISTRICT and Upper Arkansas Water Conservancy District, Objectors-Appellees,**

**and**

**Robert Jesse as Division Engineer, Appellee.**

**No. 84SA310.**

Supreme Court of Colorado, En Banc.

April 21, 1986.

As Modified on Denial of Rehearings May 19, 1986.

Law Office of Robert F. T. Krassa, Robert F. T. Krassa, Pueblo, for applicant-appellant.

Fairfield & Woods, Howard Holme, Kevin B. Pratt, Denver, for objectors-appellees.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Wendy C. Weiss, Asst. Atty. Gen., Denver, for appellee.

KIRSHBAUM, Justice.

Applicant, Pueblo West Metropolitan District (Pueblo West), appeals a portion of a decree of the water court granting

a request for change of water right.[1] Pueblo West protests the water court's imposition of a volumetric limitation on the amount of water available at the new point of diversion. Objector, Southeastern Colorado Water Conservancy District (Southeastern), asserts that the water court lacked subject matter jurisdiction to issue the decree. We conclude that the water court had subject matter jurisdiction and affirm its judgment.

In 1981, Pueblo West filed an application for a change in the place of use and point of diversion of the Wheel Ranch Ditch water right (the water right). The water right was decreed in 1896 and bore a priority date of March 1891, a relatively junior water right on the over-appropriated Arkansas River. Prior to 1916, a water wheel was used to move water from the Arkansas River into the Wheel Ranch Ditch, which water was used to irrigate the adjacent farmland. Thereafter, the landowners ceased using the water wheel, dug a well and pumped the tributary ground water into the ditch.

In 1921, a flood washed out the ditch and silted up the well. No irrigation occurred on the land until 1937, at which time the new landowner, George Vercelli, dug out the well and ditch and began to use them again. At some point in the 1950's, a new well was dug about 550 feet east of the original well and irrigation occurred as before with the use of tributary ground water. Neither of the two wells was ever decreed as an alternate point of diversion for the water right. In 1968, the Bureau of Reclamation purchased the land, but not the water right. Pueblo West's developer purchased the water right in 1969. As the result of the construction of the Pueblo Reservoir, by 1972 the former farmland was at the bottom of the reservoir.

Pueblo West's 1981 application requested a change in the place of use of the water right from the farmland to the Pueblo West golf course and a change in the point of diversion from the originally decreed ditch to the pumping station of the Pueblo Reservoir. Neither the application nor the published resume referred to either of the two wells as alternate points of diversion. Southeastern objected to Pueblo West's requested change as injurious to the vested rights of other water users and asserted that the water right had been abandoned.

The water court bifurcated the trial as to the abandonment issue and the change of water right. With regard to the issue of abandonment, the water court found that a portion of the 1921 to 1937 period of non-use was excused and concluded that use of the water via the two undecreed wells rebutted any presumption of intent to abandon arguably resulting from any of the several periods of non-use. That ruling has not been appealed.

In granting the request for change, the water court, to protect the interests of other users, imposed several conditions on Pueblo West's use of the water right, including a limitation of 14.6 acre feet per year on Pueblo West's withdrawals based on the estimated historical in-priority consumptive use of the water right. Pueblo West appeals the volumetric limitation condition and also appeals several evidentiary rulings of the water court. In its answer brief, Southeastern argues that because neither Pueblo West's application nor the resume names or describes the two wells as alternate points of diversion, the water court lacked subject matter jurisdiction to consider the application.

I

■ We first address the jurisdictional issue. Although Southeastern did not challenge the water court's jurisdiction prior to this appeal, it is axiomatic that questions of subject matter jurisdiction may be raised at any time. C.R.C.P. 12(h)(3); see Parker v. Southeastern Colorado Water Conservancy District, 174 Colo. 210, 483 P.2d 232 (1971). In water right cases, published notice of the proposed change when in compli-

1. This court has direct appellate jurisdiction of water court adjudications. See Colo. Const. art. VI, § 2(2); § 13-4-102(1)(d), 6 C.R.S. (1973); C.A.R. 1(a)(2).

ance with applicable statutory requirements, is sufficient to permit the water court to exercise subject matter jurisdiction and to bind all affected parties to the final decree. *See Danielson v. Jones,* 698 P.2d 240 (Colo.1985). The published notice takes the form of a summary resume of applications which is published monthly in the affected counties and mailed to those persons who have placed themselves on the mailing list.

Section 37–92–302(3), 15 C.R.S. (1985 Supp.), contains the following pertinent requirements regarding the contents of a resume:

> The resume shall give the name and address of the applicant, a description of the water right or conditional water right involved, and a description of the ruling sought.

In *Stonewall Estates v. CF&I Steel Corp.,* 197 Colo. 255, 592 P.2d 1318 (1979), we affirmed the water court's decision to vacate an earlier decree on the ground that the water court lacked jurisdiction to enter the decree. The water court concluded that because the published resume did not state that the subject water right was non-tributary, no jurisdiction attached and the decree entered was void. In upholding the water court's decision, we held that in the circumstances of that case the failure of the resume to refer to the non-tributary character of the subject water right constituted a serious omission of material fact because those affected by the decree were entitled to presume that the application was for tributary water only. *Pueblo West Metropolitan District v. Southeastern Colorado Water Conservancy District,* 689 P.2d 594 (Colo.1984).

Contrary to the situation in *Stonewall Estates,* 197 Colo. 255, 592 P.2d 1318, the omission of the two wells from the resume notice here was not sufficiently material to deprive the water court of jurisdiction. Pueblo West's application for change of the

water right and the resume based thereon stated that the subject water right was from waters tributary to the Arkansas River. Whether the water right was diverted from wells near the ditch or from the ditch itself would not cause confusion or mislead parties whose interests might be affected by Pueblo West's application. We conclude, therefore, that the resume sufficiently described the subject water right in this case.

## II

Pueblo West argues that the water court erred in imposing a volumetric limitation based on factors other than the water right's actual historical consumptive use of eighty-two to eighty-eight acre feet per year.[2] The water court found that the water right had been used from 1937 to 1968 to irrigate forty acres of alfalfa, corn and pasture with a consumptive use of 2.1 acre feet per acre resulting in a total consumptive use figure of eighty-two to eighty-eight acre feet per year. Because many diversions of the water right were out of priority, the water court reduced Pueblo West's total historical consumptive use figure by a percentage reflecting the number of days during a representative period, 1967 to 1980, when the water right could not have been diverted had it been strictly administered. For the period 1967 to 1980, the water court found that during the applicable 214 day season the water right was in priority an average of 19.4 days. Increasing this figure by a soil moisture carry-over component of 11.7 days, the water court calculated the average in-priority percentage for the season to be 14.5%. The water court then calculated the maximum allowable in-priority consumptive use necessary for irrigating the crops on the Wheel Ranch Ditch to be 0.31 acre feet per acre. Considering the parties' stipulation that the sprinkler system used to irrigate the golf course was 85% efficient—*i.e.,* that

---

2. The exact quantity of the water right as originally *decreed is not clear from the record.* The water court found that the 1896 decree limited the water right to a flow of 1.5 c.f.s. From a statement contained in the records of the state engineer dated October 3, 1896, it appears that the 1896 decree provided for sufficient water to irrigate 75 acres of land and water 20 head of stock.

85% of the water applied was consumptively used—the water court concluded that the allowable diversion by Pueblo West would be 14.6 acre feet per year.

The water court approved this limitation as the result of its conclusion that Pueblo West could rely only on an historical consumptive use figure which approximated diversions which would have been made in priority at a decreed point of diversion. Pueblo West argues that this limitation contravenes the rule set forth in *Southeastern Colorado Water Conservancy District v. Rich*, 625 P.2d 977 (Colo.1981). There, we held that where the water commissioner is aware of out-of-priority diversions, but does not limit or discontinue the diversions, the diversions made pursuant to the water right "though not in priority, can be considered as establishing historical use for the purpose of the change of water right proceeding here in question." *Id.* at 982 (footnote omitted). However, the factual circumstances in the present case are significantly different from those before us in *Rich*. In *Rich*, the out-of-priority diversions occurred at the decreed point of diversion, and the water commissioner had been aware of the diversions and had neither discontinued nor limited them. Here, the out-of-priority diversions occurred at two different undecreed points of diversion, and the water commissioner did not become aware of the diversions until 1964, twenty-seven years after the diversions from the wells began.[3]

Furthermore, in *Rich* we noted that prior to deciding whether to order a discontinuance of diversion under section 37–92–502(2), 15 C.R.S. (1985 Supp.), the water engineer must evaluate each diversion by a junior appropriator on a case-by-case basis to determine whether the diversion is causing material injury to senior appropriators. In *Rich*, although no conclusion was suggested as to whether the out-of-priority diversions caused injury, the engineer may have elected to permit the diversions because they did not result in injury to other users. Here, of course, the engineer had no knowledge of the diversions.

■ Although "[t]he right to change a point of diversion is limited in quantity by historical use," *Rich*, 625 P.2d at 980, we do not agree with the assumption underlying Pueblo West's argument that measurement of that historical use must include out-of-priority diversions at undecreed points of diversion. On an over-appropriated system such as the Arkansas River, many water rights are foreclosed from being used to the full extent of their decreed quantities. Until affirmative action is taken to change the water right, the decreed amount continues to quantify the water right despite the likelihood that the water user may never actually divert that amount. However, once an appropriator exercises his or her privilege to change a water right, *see* § 37–92–302, the appropriator runs a real risk of a requantification of the water right based on actual historical consumptive use. In such a change proceeding, a junior water right on the Arkansas River which had been strictly administered throughout its existence would, in all probability, be reduced to a lesser quantity because of the relatively limited actual historical use of the right.

■ In this case, Pueblo West in effect arguably seeks credit for a greater quantity of actual historical use than would have

---

**3.** The water court made the following finding:

> The Water Commissioner was unaware that any diversions were made by the Wheel Ranch Ditch water right after 1921, and his records so reflect. However, in 1968 he did learn of the presence of an operating well on the Vercelli property....

This finding is erroneous. No evidence was presented as to whether the water commissioner was aware of the well diversions prior to 1964; an affidavit from the state engineer's office indicated that there are no records of the water right prior to 1966; Cecil Shepard, the new water commissioner in 1964, testified that he saw the well pumping water into the ditch and that he warned the lessee that the state might begin to strictly administer wells, but that no action was taken to curtail the well's out-of-priority diversions for the next four years; the water commissioner's records for the water right during 1966 through 1972 merely state that no diversions were made because the Wheel Ranch Ditch was in a state of disrepair.

occurred had its use been administered at the headgate or elsewhere. However, as we have indicated, Pueblo West's water right was unadministered not because of any negligence on the part of officials charged with overseeing appropriations on the Arkansas River but because Pueblo West's predecessor in interest diverted water from undecreed points of diversion without detection. Water commissioners cannot be expected to search the area of decreed points of diversion to ascertain whether diversions are in fact occurring elsewhere. The out-of-priority diversions here represented water which belonged to senior appropriators and which Pueblo West's predecessor in essence usurped; thus, the diversion necessarily injured other water users. Because such injury occurred in the past is no reason to perpetuate such injury in the form of a decree for a change of water rights. Under these circumstances, Pueblo West cannot benefit from the unwarranted and unsupervised use of its water right.[4]

■ Accordingly, we conclude that the water court did not err in establishing Pueblo West's historical use of its water right without regard for its unwarranted out-of-priority consumptive use. We also conclude that the water court appropriately exercised its discretion in imposing a volumetric limitation of 14.6 acre feet per year on Pueblo West's future withdrawals to prevent injury to other water users on the Arkansas River.

### III

Pueblo West raises four additional evidentiary issues. It first argues that the water court erred in not admitting certain testimony of Pueblo West's expert witness, Dr. Zorich, concerning the soil and ground-water conditions of the Wheel Ranch, while permitting Southeastern's expert witness to testify with regard to those matters.

■ An expert witness may give an opinion with regard to matters within his care or skill only if the expert has some basis in fact for such opinion. *See* CRE 703, 705; *see also Denver Urban Renewal Authority v. Berglund–Cherne Co.*, 193 Colo. 562, 568 P.2d 478 (1977). Zorich stated that he was not familiar with the soil profile of the Wheel Ranch or any land adjacent thereto. Zorich was permitted to testify about general soil and groundwater conditions in the area; he was prevented from testifying only as to specific conditions on the Wheel Ranch. Southeastern's expert witness was permitted to testify with regard to specific soil and groundwater conditions on the Wheel Ranch because he stated that he personally had examined the well log of a well located on the ranch. Southeastern established a foundation for the specific testimony in question; Pueblo West did not. The water court properly excluded this portion of Zorich's testimony.

■ Pueblo West also contests the water court's selection of the period 1967 to 1980 as a representative period for diversion priorities when the water right was only exercised during two of those years. However, no records were available for any earlier periods of time, and Pueblo West did not introduce evidence to suggest that the 1967 to 1980 period was not representative with respect to diversions on the Arkansas River. In view of the testimony of an expert witness called by Southeastern to the effect that the records for this period of time did fairly reflect diversions made on the river, the water court did not abuse its discretion in selecting this period as repre-

---

4. Section 37–92–301(3)(c), 15 C.R.S. (1973), provides:

Until July 1, 1972, all diversions by well to supply a water use for which there is a surface decree may be charged against and be considered as part of the exercise of said surface decree even if the owner has not secured the right to an alternate point of diversion at the well, but nothing in this article shall be construed to prevent regulation of the well in accordance with law and within the system of priorities established for regulation of diversions of water in Colorado.

Section 37–92–301(3)(c) does not require the out-of-priority diversions made at undecreed wells to be considered in establishing Pueblo West's historical consumptive use.

sentative for the establishment of diversion priorities.

■ Pueblo West argues that the evidence failed to establish that if the water right had been diverted at the headgate it would have been strictly administered. To the contrary, Southeastern did introduce evidence that diversions by headgate along the Arkansas River were strictly administered. Furthermore, the fact remains that the water right was not diverted at the decreed headgate but was instead diverted at two undecreed, unadministered wells.

■ Pueblo West finally contends that the water court's imposition of the volumetric limitation on the water right in effect ignored a stipulation by the parties that the historical consumptive use of the water right was 86 acre feet per year. Contrary to Pueblo West's assertion, the record reveals that the water court took express notice of this stipulation. The stipulation did not, however, purport to bind the parties or the water court with respect to the amount of future withdrawals Pueblo West might be permitted to make. Based on adequate records of use for the period of 1967 to 1980, the water court determined that 85.5% of Pueblo West's past consumptive use had been out of priority and imposed a volumetric limitation upon Pueblo West's future withdrawals. As we have indicated, in the circumstances of this case the imposition of such a condition to prevent injury to others was well within the water court's discretion.

The judgment of the water court is affirmed.