**SANTA FE TRAIL RANCHES PROP-
ERTY OWNERS ASSOCIATION,
Appellant,**

v.

**HAROLD D. SIMPSON, State Engineer;
Steven J. Witte, Division Engineer; Pur-
gatoire River Water Conservancy Dis-
trict; and City of Trinidad, Appellees.**

No. 99SA91.

Supreme Court of Colorado,
En Banc.

Dec. 6, 1999.

Grimshaw & Harring, P.C., Wayne B. Schroeder, Jody Harper Alderman, Philip M. Quatrochi, Denver, Colorado, Attorneys for Appellant.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Stephen C. Cann, Assistant Attorney General, Natural Resources and Environment Section, Steven O. Sims, Assistant Attorney General, Natural Resources and Environment Section, Attorneys for the State and Division Engineers.

Justice HOBBS delivered the Opinion of the Court

This appeal is from a judgment of the District Court for Water Division No. 2 (Water Court) dismissing an application for change of use of two water rights. Appellant Santa Fe Trail Ranches Property Owners Association (Santa Fe Ranches) raises a single issue for review:

Whether diversions made pursuant to a decreed water right, although not used for decreed uses, may be considered as establishing historical use for the purpose of a change of water right proceeding, if the Water Commissioner was aware of the diversions and did not order their discontinuance or curtailment.

The Water Court answered this question as follows:

Diversions made pursuant to a decreed water right, when not used for decreed uses, may not be considered as establishing historical use for the purpose of a change of water right proceeding, regardless of whether the water commissioner was aware of such diversions and did not order their discontinuance or curtailment.

We affirm the Water Court's judgment dismissing the application.

I.

Santa Fe Ranches sought to change the use of two water rights appropriated by the Colorado Fuel and Iron Company (CF & I): (1) the Antonio Lopez at El Moro right for 0.25 c.f.s. decreed for manufacturing use,

with an appropriation date of November 1, 1861, adjudicated with Priority No. 2 on August 10, 1903, in the original adjudication for Water District No. 19; and (2) the El Moro Pipeline right for 0.5 c.f.s. decreed for domestic and manufacturing uses, with an appropriation date of December 31, 1879, adjudicated with Priority No. 122 on January 12, 1925, in Water District No. 19. The source of supply is southern Colorado's Purgatoire River,[1] a tributary to the Arkansas River. Water District No. 19 comprised that portion of the Purgatoire River and its tributaries south of the northern boundary line of Las Animas County. *See* Act of Apr. 5, 1909, ch. 177, 1909 Colo. Sess. Laws 427–28.

CF & I's appropriations occurred in connection with its production of coking coal amidst the coalfields in southern Colorado that helped to supply CF & I's steel plant in Pueblo.[2] El Moro, one of the CF & I camps, was located six miles northeast of Trinidad;[3] it employed 125 persons. *See* Ralph C. Taylor, *Colorado, South of the Border* 439 (1963); *see also* George S. McGovern & Leonard F. Guttridge, *The Great Coalfield War* 6 (1972). The production of coke began there with the building of six beehive ovens in 1876, growing to 250 ovens four years later. *See* Taylor, *supra*, at 440. The coke burning was done near the mines until 1918 when CF & I established the first by-product coke ovens in the United States at its Pueblo plant; this plant took over the functions of 2,700 coke ovens scattered throughout Southern Colorado. *See id.*

From 1966 to 1985, CF & I leased its interest in the two water rights at issue in this case to the El Moro Ditch Company (El Moro Ditch), which used the water for irrigation of lands under the El Moro Ditch.[4] CF & I then transferred all of its interest in the water rights to a third party in 1985; the El Moro Ditch Company continued to divert the water under an arrangement with the new owners. Santa Fe Ranches has an option to purchase the two water rights from the present owner; exercise of its option depends upon a change of water rights being decreed for at least thirty acre-feet of transferable consumptive use annually.

Santa Fe Ranches seeks by its application to change both of the CF & I rights from manufacturing to "municipal, domestic, commercial, industrial, irrigation, stock water, recreation, fish, wildlife, and fire protection, exchange, augmentation, and reuse and successive uses until such water has been entirely consumed." The principal use of the water would be for augmentation of depletions from three wells to serve as a central water supply for a 459–lot subdivision, located south of the City of Trinidad and immediate-

1. The Purgatoire River country has a colorful history. The Spanish called the river "El Rio de Las Animas Perdidas en Purgatorio" ("The River of Lost Souls in Purgatory"); the French, "Purgatoire"; the Anglos, "Picketwire." *See* David Lavender, *Bent's Fort* 13–14 (1954).

2. General William J. Palmer, builder of the Denver & Rio Grande Railroad, first established El Moro in 1875 as a railroad depot outside of Trinidad. *See* David Lavender, *The Rockies* 252 (1968). In 1876, he formed the Southern Colorado Coal & Town Co., acquiring 12,800 acres in the areas of Walsenburg and Trinidad. *See* Ralph C. Taylor, *Colorado, South of the Border* 433 (1963). Palmer then built the Pueblo steel plant where the first blast furnace went into operation on September 5, 1881, to begin producing rail for the burgeoning railroads of the western United States. *See id.* The steel operation led to building and operating the El Moro coke oven batteries located in Las Animas County. *See id.* at 434. A series of corporate name changes and mergers resulted in the incorporation of the Colorado Fuel and Iron Co. in 1892.

*See id.* at 435–36. For the first three decades of the twentieth century, CF & I was the largest industry of the Rocky Mountain states, developing coal properties in Gunnison, Fremont, Huerfano, and Las Animas counties and manufacturing steel rails at Pueblo. *See id.* at 436. As of 1941, CF & I's Pueblo operation was the largest steel mill west of the Mississippi, with an annual capacity of 600,000 tons and the largest single industrial establishment in the state, employing 6000 to 7000 persons. *See Colorado, A Guide to the Highest State*, compiled by Workers of the Writers' Program of the Work Projects Administration in the State of Colorado 75 (1941).

3. *See* Maps, Office of the State Engineer, "Water Division, District, Designated Groundwater Basins and Management District Boundaries" (1987); Department of the Interior General Land Office (King Map) "Map of the State of Colorado" (1902).

4. The lease rate was $50 per year, $25 payable at the beginning of the irrigation season and $25 payable at the end of the irrigation season.

ly west of highway I–25, north of the New Mexico border.

No prior change proceeding has determined the historic use of the two CF & I rights. In the Water Court, Santa Fe Ranches stated that it could not demonstrate CF & I's historic use of these rights and sought, instead, to rely on the use of them for irrigation under the El Moro Ditch from 1966 to 1997. It claimed 41.4 acre-feet of consumptive use annually for the Antonio Lopez at El Moro right and 12.6 acre-feet consumptive use annually for the El Moro Pipeline right.

The points of diversion for the CF & I rights and the El Moro Ditch rights are across the Purgatoire River from each other; CF & I's manufacturing use was made south of the river, while the irrigation use was made north of the river. The El Moro Ditch is one and a half miles long and irrigates 184 acres, of which the water commissioner for the area owns ninety-five acres. Half of the water diverted under the CF & I rights went to his own land. He testified by deposition in the Water Court that he was unaware of the decreed use of the CF & I rights, and that neither he, nor the division engineer, curtailed the irrigation diversions: "It never crossed my mind that it wasn't used for, or couldn't be used for irrigation." He also testified that CF & I's use of its rights may have ceased "maybe 30, 40 years prior" to 1966.

In his affidavit, Ralph Adkins, the CF & I employee who arranged the CF & I lease with the El Moro Ditch, stated that CF & I had maintained records of its use but these had disappeared:

I personally know that CF & I kept records of use of their water rights, including these, to assure that it could document their continued use. I have attempted to research the CF & I records, but find that CF & I has, after my departure from the company, either destroyed or misplaced all its records on these water rights.

He also stated that CF & I did not intend to abandon the water rights, that the water commissioner was aware of their diversion for irrigation and had not ordered curtailment, and that CF & I's successor in interest to the rights held them "for the purpose of sale and also did not intend to abandon these water rights." [5]

The state and division engineers continued to oppose the application after the City of Trinidad and the Purgatoire River Water Conservancy District withdrew their statements of opposition. In his affidavit, Dick Wolfe of the State Engineer's Office stated that, "The Purgatoire River is severely overappropriated. Water rights junior to 1898 generally do not receive a reliable water supply." In light of the lack of information concerning the historic use of CF & I's manufacturing rights, the engineers contended that the proposed change of use might enlarge the water rights, to the injury of others.

Asserting that use of the water for irrigation under the El Moro Ditch pursuant to the lease can properly serve as the basis for calculating the historic use of the CF & I water rights, Santa Fe Ranches submitted the following determinative question of law to the Water Court pursuant to C.R.C.P. 56(h):

Whether diversions made pursuant to a decreed water right, although not used for decreed uses, may be considered as establishing historical use for the purpose of a change of water right proceeding, if the Water Commissioner was aware of the diversions and did not order their discontinuance or curtailment.

The Water Court answered this question in the negative, ruling that (1) historic use for the decreed use of the appropriation is determinative in a change proceeding, and (2) an undecreed change of use cannot be the basis for the historic use determination. It reasoned, in part, that:

why the successors in interest to the CF & I rights did not obtain a copy of the CF & I records of use when they purchased the two rights.

5. No mention appears in the record as to whether or not diversion records of the various water commissioners in District No. 19 over the years contained information regarding exercise of the CF & I rights. Nor is there any explanation as to

Since junior appropriators are entitled to maintenance of stream conditions at the time of their respective appropriations, the omitted proceeding for change of use to irrigation would find Applicant's predecessor limited to any then existing and provable prior historic use. Applicant, these many years later, is unable to provide any information regarding quantity of historic use undertaken pursuant to the decreed uses of these rights.

In response, Santa Fe Ranches asked for dismissal of its application so that it could appeal the court's ruling: "Regrettably, the Applicant simply has no additional evidence to present. Given the Court's ruling, the applicant cannot meet its burden of proof at trial." The Water Court then dismissed the application. We uphold the order and judgment of the Water Court.

## II.

■ We hold that an undecreed change of use of a water right cannot be the basis for calculating the amount of consumable water that can be decreed for change to another use.

## A.

### *Beneficial Use—The Basis, Measure, and Limit of an Appropriation*

Santa Fe Ranches argues that (1) the water officials knew that the CF & I rights were being used for irrigation under the El Moro Ditch and did not curtail diversions for this purpose, (2) no other water users complained of injury because of the irrigation use, and (3) the undecreed use of the CF & I rights for irrigation under the El Moro Ditch is a proper basis for determining historic use in the change proceeding, and no injury to other water rights has or will occur thereby. This argument is contrary to longstanding beneficial use and adjudication law in this state; thus, we begin our analysis with a review of precedent.

Soon after statehood, which occurred in 1876, the Colorado Irrigation Convention of December 5–7, 1878, deliberated and passed resolutions addressing three problems: determination of priorities, distribution of water according to those priorities, and stream measurement. *See* Robert G. Dunbar, *Forging New Rights in Western Waters* 90 (1983). Dry years had brought the operators of the direct flow irrigation ditches on the Cache la Poudre River into conflict with each other. The upstream ditches were filling to the exclusion of downstream ditches that earlier had put the water to beneficial use. Some means was needed to fix and administer water right priorities. Resolutions of the irrigation convention led to the General Assembly's adoption of the 1879 and 1881 Adjudication Acts that consigned the determination of water rights and their priorities to the courts and the administration of the courts' judgments to water officials. *See id.* at 91–98; Act of Feb. 19, 1879, 1879 Colo. Sess. Laws 94–108 (providing for priority of rights to use of water for irrigation); Act of Feb. 23, 1881, 1881 Colo. Sess. Laws 142–61 (same).

The 1879 and 1881 Acts provided for the adjudication of irrigation rights only. The 1899 Act required adjudication for change of irrigation rights. *See* Act in Relation to Irrigation, ch. 105, 1899 Colo. Sess. Laws 235–36. The 1903 Adjudication Act made the adjudication provisions applicable to all water rights, whatever their beneficial use. *See* Act Concerning Water Rights, ch. 130, 1903 Colo. Sess. Laws 297–98. The 1919 Act required the owners of all water rights to adjudicate their priorities, upon penalty of forfeiture. *See* Irrigation, Settling Priorities to Water, ch. 147, § 8, 1919 Colo. Sess. Laws 494–95. The 1943 Act provided for original and supplemental adjudications, including adjudications for changes of water rights. *See* Act Relating to the Waters of the State of Colorado, ch. 190, §§ 22–24, 1943 Colo. Sess. Laws 628–31. The 1969 Water Right Determination and Administration Act established an application, resume notice, and determination procedure for water rights, including changes of water rights.[6] *See* §§ 37–92–

---

**6.** The 1969 Act repealed legislation that had established 70 water districts and substituted seven water divisions formed along major watershed boundaries for adjudication and administration of rights, each with a water court and a division engineer. *See* Act Concerning Water, and Enact-

302, –305, 10 C.R.S. (1999). "Change of water right" includes "a change in the type, place, or time of use" and "a change in the point of diversion." § 37–92–103(5), 10 C.R.S. (1999).

◼ Contrary to Santa Fe Ranches' contention that a change of use proceeding focuses only on injury to other water rights, the continuous stream of Colorado water law demonstrates that change of use involves two primary questions: (1) What historic beneficial use has occurred pursuant to the appropriation that is proposed for change? and (2) What conditions must be imposed on the change to prevent injury to other water rights? Only when these questions are satisfactorily addressed may the water court turn to consideration of the terms for a decree approving the change of use.

These basic predicates for a change of use have their roots in nineteenth-century water rights law, which provided that: (1) the extent of beneficial use of the original appropriation limits the amount of water that can be changed to another use, and (2) the change must not injure other water rights.

> By his legal appropriation of the amount of water sufficient for his original purpose he is entitled to that amount and may apply it to any of the beneficial uses he may see fit, as against other parties whose rights have accrued subsequently to his own, *provided the amount of water taken by him is not thereby increased beyond that of his original appropriation, nor the rights of those coming later injured or impaired in any manner.*

ing the "Water Right Determination and Administration Act of 1969", ch. 373, § 20(1), 1969 Colo. Sess. Laws 1223 (repealing Article 13 of Chapter 148, C.R.S. (1963)).

7. This is the essential premise of appropriation law throughout the west. "Beneficial use is the measure and the limit of an appropriative right." Joseph L. Sax, Robert H. Abrams & Barton H. Thompson, Jr., *Legal Control of Water Resources, Cases and Materials, Second Edition* 164 (1991).

8. We held that water may be appropriated from one stream basin for beneficial use at a location in another stream basin. *See Coffin,* 6 Colo. at 450–51.

*See* Clesson S. Kinney, *A Treatise on the Law of Irrigation* 375 (1894) (emphasis added).

◼ The property right we recognize as a Colorado water right is a right to use beneficially a specified amount of water, from the available supply of surface water or tributary groundwater, that can be captured, possessed, and controlled in priority under a decree, to the exclusion of all others not then in priority under a decreed water right. *See Shirola v. Turkey Cañon Ranch Ltd. Liab. Co.,* 937 P.2d 739, 747–48 (Colo.1997). A water right comes into existence only through application of the water to the appropriator's beneficial use; that beneficial use then becomes the basis, measure, and limit of the appropriation.[7] *See Coffin v. Left Hand Ditch Co.,* 6 Colo. 443, 447 (1882) (holding that "the first appropriator of water from a natural stream for a beneficial purpose has ... a prior right thereto, *to the extent of such appropriation* ") (emphasis added); *see also Yunker v. Nichols,* 1 Colo. 551, 555 (1872).[8]

◼ "Appropriation" is "the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law." § 37–92–103(3)(a), 10 C.R.S. (1999). The 1969 Act defines "beneficial use" as "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices *to accomplish without waste the purpose for which the appropriation is lawfully made.*"[9] § 37–92–103(4), 10 C.R.S. (1999) (emphasis added). No person may appropriate more water than is necessary for beneficial use. *See Thomas v. Guiraud,* 6 Colo. 530, 532

9. Beneficial use, though an essential feature of the Colorado Constitution's water provisions, *see* Colo. Const. art. XVI, § 6, is not defined or limited thereby. Rather, what constitutes a beneficial use tracks legislative enactments, court decisions, and, principally, the acts of appropriators who control the water to their purpose. *See, e.g., State v. Southwestern Colorado Water Conservation Dist.,* 671 P.2d 1294, 1322 (Colo.1983) (holding that mined land reclamation and dust control are beneficial uses); *see also* § 37–92–102(3), –103(4), 10 C.R.S. (1999) (providing that minimum stream flow and minimum lake level appropriations of the Colorado Water Conservation Board are beneficial uses).

(1883). Diversion of water by itself cannot ripen into a water right if the water is not used beneficially. *See Farmers' High Line Canal & Reservoir Co. v. Southworth,* 13 Colo. 111, 115, 21 P. 1028, 1029 (1889).

■ " 'Water right' means a right to use in accordance with its priority a certain portion of the waters of the state by reason of the appropriation of the same." § 37–92–103(12), 10 C.R.S. (1999). The purpose of adjudication is to fix the priority of a water right for its decreed uses so that it can be administered vis-à-vis all other decreed water rights. "The value of a water right is its priority and the expectations which that right provides." *Navajo Dev. Co. v. Sanderson,* 655 P.2d 1374, 1380 (Colo.1982).

■ The appropriator may transfer the water right to another use, *see Strickler v. City of Colorado Springs,* 16 Colo. 61, 68–72, 26 P. 313, 315–17 (1891); but, a change in the "manner of use" must be accomplished (1) "by proper court decree," (2) only for "the extent of use contemplated at the time of appropriation" and (3) "strictly limited to the extent of former actual usage." *See Green v. Chaffee Ditch Co.,* 150 Colo. 91, 105–07, 371 P.2d 775, 783 (1962) (relying on *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 272 P.2d 629 (1954)). The appropriator of native water may not enlarge the appropriation. In order to reuse or make successive use of return flows, all of the elements of an independent appropriation must be established and decreed as a separate water right.[10] *See City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 65 (Colo. 1996); *Water Supply & Storage Co. v. Curtis,* 733 P.2d 680, 682–83 (Colo.1987).

■ Property rights in water are usufructuary; ownership of the resource itself remains in the public. *See Farmers High Line Canal & Reservoir Co. v. City of Golden,* 975 P.2d 189, 198 (Colo.1999). Because beneficial use defines the genesis and maturation of every appropriative water right in this state, we have held that every decree includes an implied limitation that diversions cannot exceed that which can be used beneficially, and that the right to change a water right is limited to that amount of water actually used beneficially pursuant to the decree at the appropriator's place of use. *See Weibert v. Rothe Bros.,* 200 Colo. 310, 316, 618 P.2d 1367, 1371 (1980). Thus, the right to change a point of diversion, or type, place, or time of use, is limited in quantity by the appropriation's historic use. *See id.,* 200 Colo. at 317, 618 P.2d at 1371–72; *see also New Cache La Poudre Irrigating Co. v. Water Supply & Storage Co.,* 49 Colo. 1, 7, 111 P. 610, 612 (1910); *New Mercer Ditch Co. v. Armstrong,* 21 Colo. 357, 362, 40 P. 989, 991 (1895); *Sieber v. Frink,* 7 Colo. 148, 154, 2 P. 901, 904 (1883).

■ These limitations advance the fundamental principles of Colorado and western water law that favor optimum use,[11] efficient water management, and priority administration, and disfavor speculation and waste. *See Simpson v. Highland Irrigation Co.,* 917 P.2d 1242, 1252 (Colo.1996); Janet C. Neuman, *Beneficial Use, Waste, and Forfeiture: The Inefficient Search for Efficiency in Western Water Law,* 28 Envtl. L. 919, 962–63 (1998). Adherence to these principles serves to extend the benefit of the resource to as many water rights as there is water available for use in Colorado.[12] *See Aspen Wilderness Workshop, Inc. v. Hines Highlands Ltd. Partnership,* 929 P.2d 718, 724 (1996).

■ Quantification of the amount of water beneficially consumed in the placement of

---

**10.** Importers of water that is foreign to the natural stream system have greater rights of use and reuse for beneficial purposes than do appropriators of native water. *See* § 37–82–106, 10 C.R.S. (1999); *City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 66 (Colo.1996).

**11.** *See* § 37–92–501(2)(e), 10 C.R.S. (1999) (providing that "all rules and regulations shall have as their objective the optimum use of water consistent with preservation of the priority system of

water rights"); *Alamosa–La Jara Water Users Protection Ass'n v. Gould,* 674 P.2d 914, 935 (Colo.1983).

**12.** The availability of water arising in Colorado for beneficial use in Colorado is limited by the delivery requirements of the interstate compacts and equitable apportionment decrees to which Colorado is a party. *See Simpson,* 917 P.2d at 1247–49.

water to the appropriator's use guards against rewarding wasteful practices or recognizing water claims that are not justified by the nature and extent of the appropriator's need. *See Williams v. Midway Ranches Property Owners Ass'n, Inc.,* 938 P.2d 515, 521 (1997). We have previously observed that "many of the early Colorado decrees awarded rates of flow in excess of the amounts necessary for the petitioner's beneficial use, and some even went so far as to grant more water than a particular ditch would carry." *Farmers,* 975 P.2d at 198. Hence, the fundamental purpose of a change proceeding is to ensure that the true right—that which has ripened by beneficial use over time—is the one that will prevail in its changed form. "The General Assembly and the courts of this state have often reinforced the policy of keeping the public water resource available to those who can and will use it beneficially, as opposed to those who wish to speculate in its value and price." *Chatfield East Well Co., Ltd. v. Chatfield East Property Owners Ass'n,* 956 P.2d 1260, 1270 (1998); *see also Colorado River Water Conservation Dist. v. Vidler Tunnel Water Co.,* 197 Colo. 413, 417, 594 P.2d 566, 568 (1979); *New Mercer,* 21 Colo. at 363–64, 40 P. at 992; *Combs v. Agricultural Ditch Co.,* 17 Colo. 146, 152, 28 P. 966, 968 (1892) ("[T]he privilege of diversion is granted only for uses truly beneficial, and not for purposes of speculation.").

With this precedent in mind, we turn to its application in this case.

### B.

### *Change of Use Proceeding*

 Santa Fe Ranches seeks to dispense with the basic requirement of a change of water right proceeding that requires the proponent of the change to identify the extent of actual beneficial use of the decreed appropriation at its place of use. This it may not do. Our decision in *Orr v. Arapahoe*

*Water & Sanitation District,* 753 P.2d 1217 (Colo.1988), provides otherwise. In *Orr,* surface irrigation rights, dating as early as the 1860s, were changed in a 1969 proceeding to an alternate point of diversion for irrigation by wells. In 1981, the changed water rights were the subject of a further proceeding to change the type and place of use to municipal purposes. Because historical usage of the original surface irrigation rights had not been determined previously, we interpreted the 1969 change decree as containing an implied limitation restricting usage to that which occurred for the original appropriation. We also reiterated the fundamental principle that an appropriation cannot be enlarged:

> [A] senior appropriator is not entitled to enlarge the historical use of a water right by changing the point of diversion and then diverting from the new location the full amount of water decreed to the original point of diversion, even though the historical use at the original point of diversion might have been less than the decreed rate of diversion.

*Orr,* 753 P.2d at 1224.

*Orr* illustrates the primary function of the historical use limitation set forth by our precedents and section 37–92–305(4)(a). With its application, notice, and judicial determination requirements, change of water right adjudication serves to restrict an appropriation to the amount of its perfected use, while also allowing the priority of the right to be utilized for different uses and at different locations. *See* James N. Corbridge, Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law, Revised Edition* 245–51 (1999). In this manner, Colorado law promotes both security for water rights and flexibility for new uses and transfers of existing rights.[13] *See* Dunbar, *supra,* at 209–11.

Santa Fe Ranches argues that our decision in *Southeastern Colorado Water Conservancy District v. Rich,* 625 P.2d 977 (Colo.1981), allows it to claim the historic use made of the CF & I rights under the El Moro Ditch.

---

**13.** Uses that would suffer from enlargement of senior rights include not only traditional irrigation, municipal, and industrial uses, but also federal reserved water rights and such newly evolved appropriative uses as fish and wildlife, snowmaking, recreation, boat chutes, nature cen-

ter diversions, and stream augmentation for rafting flows. *See, e.g., Board of County Comm'rs v. Upper Gunnison River Water Conservancy Dist.,* 838 P.2d 840, 849–50 (Colo.1992); *City of Thornton v. City of Fort Collins,* 830 P.2d 915, 930–31 (Colo.1992).

There, the original appropriators of the decreed right switched a diversion from a small surface tributary of the Arkansas River to an alternate point of diversion, a well, near their house, but they made no other change to the water right. The absolute decree was for domestic, irrigation, and stock water purposes; these uses remained the same. In upholding the trial court's issuance of a change of water right decree for the alternate point of diversion, we relied on its finding of fact that "diversions by [the] well at the proposed alternate point of diversion would result in no increase in the duty of water and no increased consumptive use" of the appropriation. *Id.* at 980.

Thus, there was no question in *Rich* regarding a possible enlargement of the water right, or total or partial abandonment of it; the trial court found the change to the alternate point of diversion to be inconsequential. The objector there challenged the validity of the diversions made at the original point of diversion because they were made at a time when a legal call by senior rights on the river was in effect. We emphasized that the diversions through the original point of diversion, upon which the appropriator's absolute decree was based, had been allowed under the futile call provisions of the engineer's authority. *See* §§ 37–92–501, –502(2)(a), 10 C.R.S. (1999); *Rich,* 625 P.2d at 980–81. We then held that diversions made pursuant to the water right for the Riches' Pond and Infiltration Gallery, though not in priority, could be considered as establishing historical use for the purpose of the change of water right proceeding there in question. *See Rich,* 625 P.2d at 982. We have since determined that out-of-priority diversions will not be counted for the purpose of calculating the consumable water that can be transferred to another use through a change decree. *See Pueblo West Metro. Dist. v. Southeastern Colorado Water Conservancy Dist.,* 717 P.2d 955, 959 (Colo. 1986) (approving change decree limitation of "an historical consumptive use figure which approximated diversions which would have been made in priority at a decreed point of diversion").

Of significance here, two ingredients of the facts of *Rich* were essential to our holding:

first, no statement of opposition was filed in the prior case and the absolute right for the surface diversion had become final and was res judicata that the necessary steps had been completed to effect an appropriation, *see Rich,* 625 P.2d at 979, and, second, the trial court's findings of no increase in the duty of water and no increased consumptive use were supported by the record, and in turn supported the trial court's conclusion that the requested alternate point of diversion would not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. *See id.* at 980.

In contrast to *Rich,* where the decreed use of the appropriation and its place of use did not change, the use that Santa Fe Ranches invokes as historic use was neither for the decreed purpose of the CF & I appropriation nor was it made at CF & I's place of use. The State and Division Engineer objected on the basis of possible enlargement of the CF & I rights. As applicant for a change of use, Santa Fe Ranches had the duty to establish actual usage of the CF & I appropriations it proposed to change. *See Weibert,* 200 Colo. at 317, 618 P.2d at 1372 ("Where expansion of use is the injury asserted, establishment of historical use is the burden of the applicant."); *see also Williams,* 938 P.2d at 521 ("Over an extended period of time, a pattern of historic diversions and use under the decreed right at its place of use will mature and become the measure of the water right for change purposes, typically quantified in acre-feet of water consumed."); *New Cache La Poudre,* 49 Colo. at 4–5, 111 P. at 611.

 The degree of consumptive use historically made of a manufacturing right turns on the requirements of the particular enterprise and how it actually applied and consumed the water. Water that is not beneficially consumed in the course of using the native water is not part of the allowable consumptive use allocation of the right for change purposes. *See Williams,* 938 P.2d at 522 ("Because water rights are usufructuary in nature, the measure of a water right is the amount of water historically withdrawn and consumed over time in the course of applying water to beneficial use under the tributary

appropriation without diminishment of return flows."). The timing and amount of consumption of CF & I's use directly impacted the water available for appropriation by appropriators subsequent to CF & I who are entitled to maintenance of the conditions of the stream at the time of their appropriations. *See Weibert,* 200 Colo. at 316, 618 P.2d at 1371.

Ascertaining the timing and quantity of the actual usage of the CF & I appropriations is critical to determining under section 37–92–305(3) whether the proposed change of water right or plan of augmentation will "injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." The change must be approved if it will not cause injury. *See* § 37–92–305(3). Having been put to its proof on the question of injury due to a possible enlargement of the CF & I rights, Santa Fe Ranches defaulted in its duty of going forward on the historic use and injury issues. A change of water right must limit the amount of water being changed to the "same amount historically diverted through . . . the original decreed points of diversion." *Orr,* 753 P.2d at 1224; *see also Steffens v. Rinebarger,* 756 P.2d 1002, 1007 (Colo.1988)(holding that a "change of water right decree [must] contain an explicit limitation confining the use of the water right to the amount and time of diversions originally authorized under . . . [the] decree"); *Pueblo West Metro. Dist.,* 717 P.2d at 959 (stating that one who exercises the "privilege to change a water right, *see* § 37–92–302 . . . runs a real risk of a requantification of the water right based on actual historical consumptive use").

Thus, in the course of demonstrating actual use of the CF & I rights, Santa Fe Ranches may not substitute diversions that occurred for an undecreed use of water, irrigation, made at another point of diversion, the El Moro Ditch, and place of use, lands under the El Moro Ditch. Only if a change of the two CF & I water right decrees had been obtained for the irrigation use under the El Moro Ditch would Santa Fe Ranches have been able to claim that consumptive use.

Inquiry into total or partial abandonment is also germane to a change of water right proceeding. The apparent thirty or forty year history of disuse of the CF & I rights at El Moro, to which the water commissioner referred in his deposition testimony, raised the inference that CFI's right no longer existed or existed in a diminished amount. The intent to abandon a water right may be presumed due to a long period of disuse.[14] *See* §§ 37–92–103(2), –402(11), 10 C.R.S. (1999) (providing that failure for a period of ten years or more to apply the water to beneficial use creates a rebuttable presumption of abandonment); *City & County of Denver v. Middle Park Water Conservancy Dist.,* 925 P.2d 283, 286 (Colo.1996)(reiterating that the intent to abandon, whether by overt act or by continued and unexplained non-use for an unreasonable period of time, is the critical element in determining abandonment of a water right).

The purpose of Santa Fe Ranches' application was to generate a decreed consumptive use quantification that it could employ as augmentation credit to replace depletions from wells operating out of priority at its subdivision's central water system. To the extent that our decision in *Rich* suggests that exercise of the engineers' enforcement discretion can relieve the change of water right applicant of its burden to establish actual usage of an appropriation for its decreed use at its place of use, we overrule any such implication as being contrary to Colorado law. "One of the basic tenets of Colorado water law is that junior appropriators are entitled to maintenance of the conditions on the stream existing at the time of their respective appropriations." *Bijou,* 926 P.2d at 80.

Santa Fe Ranches relies heavily on the water commissioner's acquiescence in diversion of CF & I's rights for the non-decreed irrigation use by the El Moro Ditch.

---

14. The abandonment of certain water rights by CF & I in the Purgatoire River Valley due to its consolidation of operations at the Pueblo plant occurred under the facts of *CF & I Steel Corporation v. Purgatoire River Water Conservancy District,* 183 Colo. 135, 139–40, 515 P.2d 456, 458 (1973).

Our state legislature and courts, however, have never accepted the proposition that water officials may determine the water rights of citizens; this is a judicial function under the adjudication statutes. A right to use Colorado's surface water or tributary groundwater ripens solely by use; judgments and decrees determine what water rights exist under the law. The General Assembly has directed water officials to administer the judgments and decrees of the courts in water matters. *See* § 37–80–102(1)(a), 10 C.R.S. (1999), §§ 37–92–301(1), (3), –501.5, 10 C.R.S. (1999).

▬▬▬ Starting with Colorado's first adjudication acts, the Acts of 1879 and 1881, the General Assembly has consistently chosen to assign the water right determination function to the courts and the water distribution function to the water officials.[15] We have held that the Act of 1899, the first change of water rights statute, had among its purposes to protect the administering water official "from being required to ascertain, at his peril, any of the various questions which he might be required to consider." *New Cache La Poudre Irrigating Co. v. Arthur Irrigation Co.*, 37 Colo. 530, 533, 87 P. 799, 800 (1906). While security for water rights largely depends upon the sound exercise of the engineer's diversion curtailment enforcement power, *see Simpson*, 917 P.2d at 1248, the engineer's administrative decisions do not determine the property rights of appropriators.

▬▬▬ Here, the state and division engineers decided to participate in Santa Fe Ranches' change proceeding, in order to monitor and enforce the historic use limitation. This is an appropriate exercise of the legislature's authorization for participation by the engineers in water cases.[16] *See Wadsworth v. Kuiper*, 193 Colo. 95, 102, 562 P.2d 1114, 1118 (1977). Prior administrative

action or inaction does not estop the engineers from bringing legal and factual issues to the attention of the water court or from explaining decisions they have made. *See Park County Sportsmen's Ranch LLP v. Bargas*, 986 P.2d 262, 264–65, 268 (Colo. 1999).

▬▬▬ Our precedent supports the Water Court's order rejecting Santa Fe Ranches' claim to historic use of the CF & I rights under the El Moro Ditch for irrigation. Despite the diversion rate set forth in a decree, diversions are limited in quantity and time to those amounts that can be put to use for the decreed purpose at the water right's place of use. *See Rominiecki v. McIntyre Livestock Corp.*, 633 P.2d 1064, 1067–68 (Colo.1981) (holding that proof in a change proceeding requires demonstration of the decreed use at the place of use intended to be served by the appropriation). The proponent of the change has "the burden of showing absence of injurious effect." *Id.* at 1068. In a change of use and augmentation case, the applicant must demonstrate that the timing of diversions and the quantity of consumption for the changed use will not exceed those of the perfected appropriation and that return flows of native waters from the decreed use at its place of use—upon which junior appropriators and prospective new appropriators often depend for their supply—will not be diminished. *See Weibert*, 200 Colo. at 316, 618 P.2d at 1371. The statute intends that protective conditions necessary to prevent injury to other water rights will be predicated on the evidence of historic use. *See* § 37–92–305(4)(a); James N. Corbridge, Jr., *Historical Use and the Protection of Vested Rights: A Challenge for Colorado Water Law*, 69 U. Colo. L. Rev. 503, 505–10 (1998).

▬▬▬ Without evidence of CF & I's utilization of the two rights at its El Moro

---

**15.** Water rights are decreed to structures and points of diversion in recognition that a water right is a right of use and constitutes real property in this state, and the owners and users of water rights may change from time to time. *See Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 39 (Colo.1997). The General Assembly has provided that the state and division engineers shall enter into their records the water court judgments and decrees and distribute water accordingly. *See* § 37–92–304(8), 10 C.R.S. (1999).

**16.** This action corrected what critics have lamented to be a major flaw of the Colorado system, that the state engineer was not allowed under the earlier Adjudication Acts to represent the public and question the accuracy of claims. *See* John E. Thorson, *State Watershed Adjudications: Approaches and Alternatives*, 42 Rocky Mt. Min. L. Inst. 22–8, –9 (1996).

operation, Santa Fe Ranches cannot meet its burden of going forward under section 37–92–305(3). Thus, we answer the determinative question of law in this case as did the Water Court. An undecreed change of use of a water right cannot provide the basis for quantifying the right for change purposes. The amount of consumable water available for transfer depends upon the historic beneficial consumptive use of the appropriation for its decreed purpose at its place of use. However, when historic use of a water right has been litigated and determined through a prior change proceeding, the court's judgment and decree control the matter, and the historic use inquiry cannot be reopened, absent a further undecreed change or enlargement. *See Farmers,* 975 P.2d at 203; *Williams,* 938 P.2d at 526.

 Santa Fe Ranches contends that a holding adverse to its position necessarily means that exchanges of water, leases of water, and other water management practices identified by Colorado statutes must be disallowed. We do not agree. The owner of a water right may lease, loan, or exchange water under the applicable statutes.[17] Sections 37–83–104 and –105, 10 C.R.S. (1999), provide that it is lawful for the owners of water rights to exchange or loan water as specified therein. Loans are to be accomplished by notice in writing, signed by the owners participating, stating the length of time they shall continue, "whereupon said division engineer shall recognize the same in his distribution of water." § 37–83–105. Exchanges made pursuant to the statute are likewise subject to state engineer administration. *See* § 37–83–104. Section 37–83–106, 10 C.R.S. (1999), recognizes that political subdivisions of the state may lease or exchange water, but the statute also cautions that any "water rights or changes of water rights which are necessary to implement such agreements shall be adjudicated as provided by law." Section 37–92–102(3), 10 C.R.S. (1999), allows the Colorado Water Conservation Board to lease water from oth-er appropriators for use in the state's instream flow program and empowers the board to initiate such water court applications as may be necessary.

The question before the Water Court was whether an undecreed change of the two CF & I water rights can be the basis for decreeing a change of those rights, without regard to the amount of water consumed beneficially for CF & I's original appropriation. The Water Court correctly refused to allow Santa Fe Ranches to substitute evidence of an undecreed change to irrigation use under the El Moro Ditch for evidence of the historic manufacturing usage of the two CF & I water rights for its facility.

### III.

Accordingly, we affirm the Water Court's judgment dismissing Santa Fe Ranches' change of water right application.

The question in the case before us concerns the extent of the original appropriation for the purpose of quantifying transferable consumptive use in a change case and does not implicate statutorily recognized water management practices.

---

17. Nor does our holding affect utilization of the upstream storage and substitute supply provisions of section 37–80–120, 10 C.R.S. (1999). These provisions allow out-of-priority diversions under conditions statutorily designed to protect seniors against injury to their appropriations.