Mr. Justice Day
delivered the opinion of the Court.
Plaintiffs in error are two of fifty-four protestants in a proceeding in which the City of Walsenburg sought a decree with relation to its water rights purchased from neighboring land owners. The other protestants are not challenging the decree.
Ackerman is the owner of Stevens and Maria Reservoirs with storage rights senior to the storage rights of the City of Walsenburg but junior to the direct flow rights which Walsenburg purchased. The Huerfano Cucharas Irrigation Company owns the Cucharas Valley Reservoir with storage rights junior to Walsenburg. They will be referred to herein as protestants.
Walsenburg acquired its decrees for municipal purposes by appropriation. All of its other water rights were acquired by purchase, and the beneficial use to which those rights were originally put by the respective appropriators were for irrigation or agricultural and domestic use. The city’s water rights purchased in 1904, 1933, 1946, and 1955 were adjudicated in an original *307 adjudication (the Read decree) dated June 12, 1889. These were direct flow rights for which the decreed purpose was irrigation. Storage rights purchased in 1923 with appropriation dates from 1901 to 1905 were adjudicated in what is known as the Atwood Decree in 1921. Each storage decree contains a finding that the reservoir was originally constructed or is operated and maintained for the storage of water for agricultural and domestic purposes. The following table shows all of the rights in question:
WATER RIGHTS OF CITY OF WALSENBURG Direct Flow Water Rights
Rate of Flow
Priority No. Appropriation Date cu. ft. per sec. Decreed Purposes Date Acquired by City
1 5-30-1863 .875 Irrigation 1-31-46
1 5- 30-1863 2.0 Irrigation 5-13-55
2 6- 15-1863 .5 Irrigation 5-13-55
3 6-30-1864 1.5 Irrigation 10-18-22
4 5-15-1865 1.5 Irrigation 4- 21-04
12 4- 1-1869 .21 Irrigation
17 5- 1-1871 .5 Irrigation 5- 13-55
40 5-15-1874 .7 Irrigation 5-13-55
46 5-10-1875 .3 Irrigation 5-13-55
61 3- 1-1884 20.0 Irrigation 1946
328 5- 2-1904 7.0 Municipal 5- 2-04
Storage Rights
Priority Appropriation Amount No. Date Ac.-Ft. Decreed Purposes Date Acquired by City
205 3-21-1901 70.9 Ag. & D’om. 1923
206 3- 21-1901 13.8 Ag. & Dom.
232 4- 4-1901 1148.0 Ag. & Dom.
249 4- 30-1901 2296.0 Ag. &Dom.
329 5- 2-1904 411.46 Municipal 5-2-1904
*308 348 11-25-1905 277.0 Ag. & Dom.
4- 2-1917 108.38 Municipal
2-20-1923 203.6 Municipal 2-20-23
11-19-1945 163.0 Municipal 11-19-45
WATER RIGHTS OF PROTESTANTS Storage Rights
Reservoir Appropriation Amount Date Ac. Ft. Decreed Purposes
Stevens 8-18-1887 1,258 Irrigation
Maria 5- 3-1872 238 Irrigation
Cucharas
Valley 3-14-1906 31,958 Irrigation
Shortly after its 1955 purchase of five direct flow rights, Walsenburg filed in a supplemental adjudication proceedings a petition which sought from the court a decree,
“* * * adjudging that this petitioner is entitled to divert water by means of the ditches and reservoirs hereinabove mentioned whenever said water is, and the priorities thereof are, available, to the municipal water system of petitioner for storage for municipal purposes and to apply said water for municipal purposes and uses, such as are usual, customary, and necessary for municipal water supply.” (Emphasis added.)
A decree was entered in that supplemental adjudication proceeding covering all matters except the issues raised by Walsenburg’s petition to be allowed to store direct flow rights and use them for municipal purposes. Nevertheless Walsenburg continued the practice initiated as far back as 1904 and augmented by its 1946 and 1955 acquisition of water rights to store so much of the direct flow water as was not needed for immediate municipal purposes. For nine years no action had been taken by the court on Walsenburg’s 1955 petition.
Then in 1964 Walsenburg brought another action to obtain an alternate point of diversion for the first four direct flow rights listed in the table. In 1965 the state *309 water officials became aware that Walsenburg was storing direct flow of water originally decreed for irrigation and ordered the practice stopped. Walsenburg obtained an injunction in March of 1965 prohibiting the state officials from interfering with its storage practices pending the determination of the matter in court. Thereupon the parties stipulated that Walsenburg’s supplemental petition for the decree sought in 1955 but unadjudicated could be decided by the court in the 1964 action brought to obtain an alternate point of diversion for the direct flow rights. The stipulation provided that the alternate diversion could be used on an interim basis.
At the trial the decree granting Walsenburg’s request was granted together with the decree granting a second point of diversion for the first four water rights listed in the table. Plaintiffs in error do not challenge or question the latter portion of the decree, but do seek reversal of the other decreed rights. Pertinent parts of the decree granting Walsenburg its new rights to which error is assigned follow:
“3. Petitioner, the City of Walsenburg, is hereby granted the right to use all of its decrees, without exception, listed in paragraph 2 of the Findings of Fact herein, not only for irrigation, but also for domestic and culinary use, for fire protection, for sewer flushing, for street sprinkling and flushing, for generation of steam and electricity, for manufacturing, for recreation, and for such other purposes and uses as are usual or customary for municipal purposes and for the welfare of the inhabitants of a municipality; PROVIDED, HOWEVER, that ‘irrigation’ as used herein shall mean lawn and garden, park and other municipal irrigation and shall not mean rental or leasing by the City to farmers and ranches for irrigation of crops. * * *
“4. Petitioner, the City of Walsenburg, may continue to store its direct flow rights in any of its several reservoirs, whenever the same are not needed for the immediate use by its citizens and for municipal purposes.”
*310 It is axiomatic that a decreed water right is a valuable property right which can be sold and conveyed. Also point of diversion and the manner of use may be changed, but such a change may be permitted only upon such conditions that the rights of other users from the same source are not injuriously affected. Green v. Chaffee Ditch Co., 150 Colo. 91, 371 P.2d 775; Brighton Ditch Co. v. Englewood, 124 Colo. 366, 237 P.2d 116.
The burden of proof to establish that a change of use will not injure the rights of other users from the same source rests on the petitioner. Green v. Chaffee Ditch Co., supra. On the other hand, it has been held that the protestants must go forward to demonstrate some injury.
“* * * [I]n this class of cases an injunction will not issue until it is demonstrated clearly and conclusively that a diminution in the water supply to which the party complaining is lawfully entitled is occasioned by reason of the diversion and use to which objection is made.” Del Norte Dist. v. Santa Maria Reservoir Co., 108 Colo. 1, 113 P.2d 676.
See also Brighton Ditch Co. v. Englewood, supra.
The foregoing principles of law have heretofore been applied to the change of beneficial application of water from one category, e.g., irrigation, to another category, e.g., domestic use or use for municipal purposes. It is contended by the protestants that there is no law in Colorado permitting the change of a water right — a direct flow right — to a storage right. Thus in their writ of error the protestants assert:
1. That as a matter of law the court erred in decreeing that a portion of Walsenburg’s direct flow rights could be diverted to storage in its five reservoirs.
2. That if it is determined that the court properly could decree such a change of right, then the test of non-injury is applicable, and that the finding by the court of non-injury to the senior storage rights of Ackerman *311 and the junior storage rights of Cucharas Irrigation are not supported by the record.
I.
On the first assignment of error we do not believe that the plaintiffs in error are in a position to attack the decree of the court on the grounds asserted. The case was tried on the stipulation of the parties agreeing that the court could entertain the request of Walsen'burg to make the change requested. Suffice it to say that in Colorado Milling & Elevator Co. v. Larimer & Weld Irrigation Co., 26 Colo. 47, 56 P. 185, this court, as early as 1899, said that an appropriation of water for irrigation purposes may be changed to a use for storage, but such change cannot be made to the detriment of other appropriators whose rights are subsequent to the appropriation for irrigation, but prior to the appropriation for storage. The court further stated that when the water in the stream is needed by the subsequent appropriators, the diversion of the prior appropriator for storage purposes would be limited to what he was entitled to divert for irrigation purposes, both as to amount and time of diversion. The state legislature has given statutory recognition of this rule by providing for such a change if no injury will result or condition can be imposed to prevent injury. See Session Laws of Colorado 1969, chapter 373, sections 148-21-18 et seq.
We presume that in this case the officials charged with the administering of the various appropriations under the decree of the court herein will not deviate from guidelines in Colorado Milling & Elevator, supra, and will allow the diversion only according to the various priorities and under the limitations as to the time of year inherent in them.
Because of the stipulation, the parties in the trial of the case were concerned with and presented evidence only on the question of injury to the protestants and other appropriators. Thus in our view the only question before this court is whether the evidence of non-injury *312 and the finding by the trial court to that effect is supported by the record.
II.
Before addressing ourselves to whether the court was correct in finding that there was no injury to the protestants and other appropriators who appeared in the trial court, we deem it necessary to make the observation that counsel in this case contented themselves with presentation of both sides of the controversy upon the opinion of two experts. Each of these witnesses testified for the most part on generalities, custom and usage, general hydrology and engineering principles, general observations and conclusions from historical recollections, native knowledge acquired either by long residency in the area or through residents of many years on the river. There was no offer of records of actual historical use and consumption as compared to the water decreed; that is to say, the court was not favored with any documentation as to the number of acres actually irrigated by those who had sold the direct flow rights to Walsenburg or whether they had ever put to beneficial use all the water decreed. There was no testimony, through measurements or otherwise, as to how much water actually was left to the river before Walsenburg began to use and store it to the full extent of the decreed rights.
As an example of ether deficiencies in the record, the city’s expert made the bald statement that in his opinion the original owners of direct flow rights who were using water for irrigation would return no water to the stream, but offered no testimony based on any tests or records as to whether water turned into the farms to which the priorities were decreed for irrigation was actually and in fact consumed.
There was some hint of the fact, but no credible evidence, that the sellers of two of the priorities were continuing to irrigate their lands to the same extent after selling all of their direct flow water rights to Walsenburg. It was admitted by the experts as a hypothetical matter *313 that if this double use of water was in fact being made the depletion of the stream would be obvious. There was no finding by the trial court whether this double use existed and no direction in the decree to dry up the lands from which the water right had been sold. In addition there was a general statement to the effect that it was common knowledge that farmers on the reservoir stored some of their direct flow water in ponds on their property. What specific priorities were involved in this unauthorized storage practice, the size of the ponds, the number of acre feet involved, and other pertinent evidence was not offered.
Thus, in a case where the city purchased no more than their predecessors owned, the court was presented with a case based on pure conjecture.
 The trial court can only make a determination and enter a decree on the case as made. The protestants, although agreeable to the qualification of the city’s witness as an expert, attack his testimony as incredible and unbelievable. However, it is the court and not the parties who is the judge of the credibility of the witnesses and of the weight to be given to their testimony.
Taking the record as made, it amply supports the finding of the trial court. Accepting the testimony of the city’s expert, as the court apparently did, Walsenburg sustained the burden of proving that injury had not resulted to other appropriators by reason of the use to which Walsenburg was putting its water. Also, on the basis of the record, protestants did not go forward to show any specific injury to its decreed rights. In fact, when asked how much of the water would have reached the Cucharas Valley Reservoir if water were used historically back to 1904 and before, the expert for the protestants answered, “We have made no runs on that.”
With reference to the Stevens and Maria Reservoirs owned by Ackerman, there was no measurable proof as to loss of decreed storage rights in the past. There was testimony that the reservoirs were not full “when they *314 were studied” by the expert; 'but the evidence was extremely vague because there was no evidence introduced to show that Ackerman’s decrees had ever been filled or the extent to which his storage rights were unsatisfied, if they were.
Evidence in the record which supports the court’s findings and decree was as follows: (a) The irrigation users of the direct flow priorities during irrigation season will return 40% to 50% of the water to the stream; (b) the city during the time of irrigation of the lawns and shrubs of the residents will nevertheless return through its sewage outflow approximately 60% of the direct flow water used; (c) in the non-irrigating season Walsenburg returns approximately 100% of the water used through its outflow below the city to appropriators downstream from that point; (d) the return flow of water from the city during the winter months is warm water, and as a result the river and the ditches do not ice-over below the city, thus making more water available for the fulfilling of the storage decrees below the city than would otherwise be the case. Whether the use of water in the non-irrigation season by the city is under previous decrees or by virtue of an undecreed new appropriation is not presented to us and is not decided herein.
Additionally, it was shown that the city has been using and storing water since 1904, acquiring the new rights as its growth and needs made necessary. But during all that time neither the appropriators nor the officials complained about the practice. The court concluded that the failure to protest over the years constituted laches by the protestants. We do not give our approval to that conclusion by the trial court, but the same evidence that no appropriator complained about the city’s use of the water is a strong indication that the flow of the river had not been altered or changed so dramatically as to alert any of the appropriators. The users of the river for a number of years apparently observed no significant alteration in the flow of the stream to cause them to make *315 inquiry of the water officials as to whether the priorities on the river were being violated.
We affirm the decree entered by the trial court with the exception of the failure of the court to deal with the matter of the possible continued use by the sellers of part of the water rights which have been sold to the city. We therefore remand the cause with directions to the trial court to modify the decree by an order therein to the water officials to close off all ditches to the lands to which the priorities sold to the city were decreed and to ascertain that they are no longer being irrigated.
Mr. Justice Kelley not participating.