Applicant–Appellant: HIGH PLAINS A & M, LLC, a Colorado limited liability company,

v.

Objectors–Appellees: SOUTHEASTERN COLORADO WATER CONSERVANCY DISTRICT; Lower Arkansas Valley Water Conservancy District; District 67 Irrigating Canals Association and its members, the Amity Mutual Irrigation Company, the Fort Bent Canal and Irrigation Company, Keesee Ditch, Buffalo Mutual Irrigation Company, X Y and Graham Canals, Manval Canal and Irrigation Company, and the Hyde Mutual Ditch Company; Carl M. Shinn; Mary Jane Shinn; Wendy S. Shinn; Board of Water Works of Pueblo, Colorado; Colorado Springs Utilities; Lake Henry Reservoir Company; Lake Meredith Reservoir Company; Colorado Canal Company; Harold D. (Hal) Simpson, State Engineer; Steven J. Witte, Division Engineer for Water Division 2; Colorado Water Conservation Board; Arkansas Valley Ditch Association and its individual members, Bessemer Irrigating Ditch, Oxford Farmers Ditch Company, High Line Canal Company, Rocky Ford Ditch Company (Board of Water Works of Pueblo, Colorado named separately above); Catlin Canal Company, individually and as a member of the Arkansas Valley Ditch Association; City of Aurora; Bent County Board of County Commissioners; Bourne Limited Partnership; Stanley V. Cline, individually, and as Personal Representative of the Estate of Bonnie Cline and the Estate of Joe Cline; Clover Meadow Lateral Ditch Company; City of Colorado Springs; Colorado Water Protective and Development Association; Columbine Lateral Ditch Co. and members; Consolidated Ditch Lateral Inc. and members; Contibeef LLC, d/b/a Colorado Beef; Rex Davis; Alberta Davis; Enterprise Lateral, an unincorporated association; the Fort Lyon Canal Company; James A. Gruenloh; Holbrook Mutual Irrigating Company; Lyle T. Japhet, as trustee for the Lyle T. Japhet Trust; Willard Kasza; Andrew Kern Drainage Ditch, Priority Number 65; City of Lamar; Lower Arkansas Water Management Association; Robert C. Lubbers; Raymond D. Mauch; May Valley Water Association; Donald Martin McBee; Donald Marvin McBee; McClave Lateral, an unincorporated association; Board of County Commissioners of the County of Otero; Public Service Company of Colorado d/b/a Xcel Energy; Pueblo, a municipal corporation; Smith Mutual Ditch Company; St. Charles Mesa Water District; Sunflower Lateral, an unincorporated association; Timberlake Grazing Association, Inc.; United States of America; Upper Arkansas Water Conservancy District; and Valley Water Protection Association, LLC and individual members.

Applicants/Appellants: HIGH PLAINS A & M, LLC, a Colorado limited liability company; and Wollert Enterprises, Inc., a Colorado corporation,

v.

Objectors/Appellees: SOUTHEASTERN COLORADO WATER CONSERVANCY DISTRICT; Lower Arkansas Valley Water Conservancy District; District 67 Irrigating Canals Association and its members, the Amity Mutual Irrigation Company, the Fort Bent Canal and Irrigation Company, Keesee Ditch, Buffalo Mutual Irrigation Company, X Y and Graham Canals, Manval Canal and Irrigation Company, and the Hyde Mutual Ditch Company; Carl M. Shinn; Mary Jane Shinn; Wendy S. Shinn; Board of Water Works of Pueblo, Colorado; Colorado Springs Utilities; Lake Henry Reservoir Company; Lake Meredith Reservoir Company; Colorado Canal Company; Harold D. (Hal) Simpson, State Engineer; Steven J. Witte, Division Engineer for Water Division 2; Colorado Water Conservation Board; Arkansas Valley Ditch Association and its individual members, Bessemer Irrigating Ditch, Oxford Farmers Ditch Company, High Line Canal Company,

Rocky Ford Ditch Company (Board of Water Works of Pueblo, Colorado named separately above); Catlin Canal Company, individually and as a member of the Arkansas Valley Ditch Association; Arbor Lateral Company; City of Aurora; Bent Conservation District; Bent County Board of County Commissioners; Bourne Limited Partnership; Stanley V. Cline, individually, and as Personal Representative of the Estate of Bonnie Cline and the Estate of Joe Cline; Clover Meadow Lateral Ditch Company; City of Colorado Springs; Colorado State Division of Wildlife and Wildlife Commission; Colorado Water Protective and Development Association; Columbine Lateral Ditch Co. and members; Consolidated Ditch Lateral Inc. and members; Contibeef LLC, d/b/a Colorado Beef; Rex Davis; Alberta Davis; Don Downing; Bonnie J. Earl, as trustee for the Earl Living Trust; Enterprise Lateral, an unincorporated association; the Fort Lyon Canal Company; Hans Friederichs, Jr. and Joleyne White–Heckman Friederichs, as members and representatives of the Stony Point Lateral, an unincorporated association; James A. Gruenloh; Burt Heckman, individually, as partner with Fred Heckman, as a member and representative of the McClave Lateral, an unincorporated association and as owner of the A. Reyher Seep One Ditch; Ruth Hency; Dale Hency; Holbrook Mutual Irrigating Company; Lyle T. Japhet, as trustee for the Lyle T. Japhet Trust; Willard Kasza; Andrew Kern Drainage Ditch, Priority Number 65; City of Lamar; Lower Arkansas Valley Watershed Association of Conservation Districts; Lower Arkansas Water Management Association; Robert C. Lubbers; Raymond D. Mauch; May Valley Water Association; Donald Martin McBee; Donald Marvin McBee; McClave Lateral, an unincorporated association; McClave Water Association; Kent and Peg Miller, as Personal Representatives for headgates 91, 95, 112 of the Fort Lyon Canal; Board of County Commissioners of the County of Otero; Prowers County Board of Commissioners; Public Service Company of Colorado, d/b/a Xcel Energy; Pueblo, a municipal corporation; Reed & Ullom, a general partnership; Lorraine Schleining; Stoney Point Lateral, an unincorporated association; Smith Mutual Ditch Company; St. Charles Mesa Water District; Sunflower Lateral, an unincorporated association; Timberlake Grazing Association, Inc.; United States of America; Upper Arkansas Water Conservancy District; Valley Water Protection Association, LLC and individual members; Lance O. Verhoeff; Verhoeff Farms, Inc.; the Wheatridge Mutual Lateral Ditch Company; Wiley Drainage District; Wiley School District Re–13JT; and Mike Wyckoff as Personal Representative for headgates 101, 112, of Fort Lyon Canal.

Nos. 04SA266, 04SA267.

Supreme Court of Colorado.

Sept. 12, 2005.

As Modified on Denial of Rehearing Oct. 11, 2005.

See also 2005 WL 1706399.

712

Harvey W. Curtis & Associates, Harvey W. Curtis, David L. Kueter, Patricia A. Madsen, Sheela S. Stack, Englewood, for Applicants/Appellants for case numbers 04SA266 and 04SA267.

Burns, Figa & Will, P.C., Stephen H. Leonhardt, Scott A. Clark, Alix L. Joseph, Englewood, for Objector/Appellee Southeastern Colorado Water Conservancy District.

Lefferdink Law Office, LLC, John S. Lefferdink, Lamar, for Objector/Appellee The Fort Lyon Canal Company.

Carlson, Hammond & Paddock, LLC, William A. Paddock, Mary Mead Hammond, Beth Ann J. Parsons, Denver, for Objectors/Appellees Board of Water Works, Pueblo, Colorado, Colorado Springs Utilities, Lake Henry Reservoir Company, Lake Meredith Reservoir Company, Colorado Canal Company.

Mark A. MacDonnell, Las Animas, for Objector/Appellee Bent County Board of Commissioners and Bent Conservation District.

Shinn, Steerman & Shinn, Donald L. Steerman, Lamar, for Objectors/Appellees District 67 Irrigating Canals Association, Amity Mutual Irrigation Company, Carl M. Shinn, Mary Jane Shinn and Wendy S. Shinn.

Mendenhall & Malouf, R.L.L.P., H. Barton Mendenhall, Rocky Ford, for Objector/Appel-

lee Lower Arkansas Water Conservancy District.

Trout, Raley, Montaño, Witwer & Freeman, P.C., Peter D. Nichols, Robert V. Trout, Denver for Objector/Appellee Lower Arkansas Water Conservancy District.

John W. Suthers, Attorney General, Alexandra L. Davis, Assistant Attorney General, Natural Resources and Environment Section, Denver, for Objectors/Appellees Colorado Water Conservancy Board, State and District Engineers.

Fischer, Brown & Gunn, P.C., Brent Bartlett, William H. Brown, Fort Collins, for Amici Curiae Cache La Poudre Water Users Association, Thompson Water Users Association, and Northern Colorado Water Conservancy District.

Duncan, Ostrander & Dingess, P.C., John M. Dingess, Austin Hamre, T. Daniel Platt (Special Counsel), Denver, for Amicus Curiae the City of Aurora, acting by and through its Utility Enterprise.

Trout, Raley, Montaño, Witwer & Freeman, PC, Robert V. Trout, Douglas M. Sinor, Denver, for Amicus Northern Colorado Water Conservancy District.

HOBBS, Justice.

Applicants High Plains A & M, LLC and Wollert Enterprises, Inc. (collectively, "High Plains") appeal the water court's dismissal of their applications for change of water rights. High Plains applied to change water rights historically used for irrigation to any one of over fifty proposed uses in any of twenty-eight Colorado counties. The water court found the change application "so expansive and nebulous" that there was no way to determine whether vested water rights would be injured by the change or to determine if there would actually be a new beneficial use made of the water. The court found that the proposed changes were "such a deviation from the original right" that they effectively requested a new water right. As such, the court found that the applications violated Colorado's anti-speculation doctrine, and granted the objectors' motion for summary judgment.

The water court decision and the briefs and arguments of the parties focused on the application of the anti-speculation doctrine to change applications. Reviewing our cases and the applicable statutes, we determine that the anti-speculation doctrine is rooted in the requirement that an appropriation of Colorado's water resource must be for an actual beneficial use.

We hold that, in defining "[c]hange of water right" to include "a change in the type, *place,* or time *of use*" and "a change in the point of diversion" in section 37–92–103(5), C.R.S. (2005)(emphasis added), and in defining "appropriation" in section 37–92–103(3)(a)(I) and (II), Colorado's Water Right Determination and Administration Act ("the 1969 Act") anticipates, as a basic predicate of an application for a decree changing the type and place of use, that the applicant will sufficiently demonstrate an actual beneficial use to be made at an identified location or locations under the change decree, if issued.

Accordingly, we affirm the water court's judgment dismissing High Plains's change of water right applications, without prejudice to re-filing when a definite location or locations for beneficial use of the water can be identified in the applications and confirmed in the water court's proceedings.

I.

The Fort Lyon Canal Company (FLCC), a mutual ditch company in southeastern Colorado since 1897, operates an extensive system of canals and reservoirs with decreed Arkansas River direct flow and storage water rights for the benefit of its shareholders. FLCC's canals total approximately 150 miles irrigating nearly 93,000 acres of agricultural land located between La Junta and Lamar; aside from the Fort Lyon Canal, the longest in Colorado, the company has also developed an extensive reservoir system.[1] FLCC is the largest ditch company in the Arkansas River Basin, with 93,989.41 outstanding shares.

High Plains is a private water investment company. It has purchased approximately 115 farms served by the Fort Lyon system, along with 20,000 FLCC shares. High

---

**1.** For a history of FLCC see O. Ray Dodson, *The Fort Lyon Canal: The First 100 Years 1897 to* *1997* (1997).

Plains also owns options to purchase over 8,000 additional shares, for a total ownership and control of almost 29,000 shares, or approximately thirty percent of all the outstanding FLCC shares.

On December 31, 2002 and March 28, 2003, High Plains filed two essentially identical change applications for different blocks of shares it has acquired. An independent shareholders group ("ISG") filed a third, virtually identical application. ISG consists of forty-five ranchers and farmers holding almost ten percent of FLCC shares. The water court consolidated the three applications. We address the ISG application in the companion case announced today, *ISG, LLC v. Arkansas Valley Ditch Assoc.*, No. 04SA268, 120 P.3d 724, 2005 WL 2203234 (Colo. Sept.12, 2005).

The FLCC water rights sought to be changed have priority dates ranging from 1884 to 1969. The decreed points of diversion and storage include several reservoirs, supply ditches, and pipelines along the eastern stretches of the Arkansas River and its tributaries: the Fort Lyon Canal, the Fort Lyon Storage Canal, Horse Creek Reservoir, Horse Creek Supply Ditch, Adobe Creek Reservoir, Adobe Creek Supply Ditch, Thurston Reservoir, Thurston Pipeline, Pueblo Reservoir, John Martin Reservoir, and Queen Reservoir.

The applications propose several new points of diversion, including at headgates on the Holbrook and Colorado canals and "one or more alternate points of diversion" along the Arkansas River between its confluences with Adobe Creek and the Purgatoire River. The applications propose that water diverted at these new points may be stored in Holbrook, Dye, Lake Meredith, Lake Henry, and Pueblo Reservoirs. The applications do not identify structures owned or slated for construction by High Plains that would transport the water from these diversion and storage points to particular new places of use.

The applications propose to change the place of use to any of twenty-eight counties where the water might be used:

[i]n addition to lands currently under the Fort Lyon Canal, the subject water rights, both for the previously decreed uses and for the proposed new uses, may be used on any lands that can be served by the subject water rights from the existing and decreed points of diversion and/or places of storage and/or from the proposed alternate points of diversion and/or places of storage listed hereinabove within the following Colorado counties ...: Otero, Bent, Prowers, Pueblo, Crowley, Kiowa, Custer, Fremont, Chaffee, Park, Teller, El Paso, Lincoln, Elbert, Douglas, Jefferson, Lake, Clear Creek, Gilpin, Denver, Arapahoe, Adams, Washington, Boulder, Broomfield, Larimer, Weld, and Morgan.

The change applications list an array of changed uses High Plains wants decreed:

[f]rom irrigation and other presently decreed uses to: all beneficial uses, including but not limited to irrigation, municipal, domestic and household purposes, drinking, cooking, cleaning, showers, toilets, irrigation of yards, lawns, shrubbery, trees, pools, fountains, and landscapes, watering domestic animals; mechanical, manufacturing, and industrial, military, and governmental purposes; bottled water; generation of electric power and power generally; fire suppression and protection; sewage treatment; street sprinkling; irrigation of parks, grounds, golf courses, and open spaces; recreation, golf course hazards, ponds, fishing, and fish propagation; agricultural uses, livestock watering and aquiculture; land and reservoir evaporation; maintenance, preservation and conservation of wildlife, wildlife habitat, wildlife propagation, and wetlands; creating, maintaining and enhancing aesthetic values; in-stream flow; erosion control, siltation control, and flood control; maintaining storage reserves; adjustment and regulation; augmentation; replacement; groundwater recharge; exchange. . . .

The applications state that "[a]fter the change, the subject water rights will still be able to be utilized for agricultural and irrigation purposes ... on lands under the Fort Lyon Canal."

The applications seek a decree for one-hundred percent consumptive use of the water derived from exercise of the changed water rights:

[a]pplicants seek a decree from the Court that they have the right to use, reuse, and successively use to extinction, and dispose of, by sale, exchange or otherwise, all water lawfully diverted and/or stored pursuant to any decree entered in this case.

In compliance with FLCC bylaws, High Plains and ISG made a single, lengthy presentation to the FLCC board of directors regarding their proposed changes to their shares. After considering the evidence presented, the FLCC board found that the changes could be implemented without injury to other shareholders, if specific terms and conditions were imposed. Specifically, the board rejected the applicants' formulae for determining historic consumptive use and their characterization of certain water as non-tributary, thereby increasing the amount of return flow that they would have to pay back to the system under the change plan. Further, the board required the applicants to submit written agreements with all shareholders on lateral ditches affected by the change or used for return flow, imposed particular requirements for revegetation and management of dry-up land, and required specific survey and accounting procedures for the applicants' planned use of FLCC reservoirs for storage. The board approved the proposal to continue taking the decreed shares in rotation with other users and to continue to pay annual assessments.

The water judge granted a motion by High Plains to consolidate its two applications. High Plains then filed a motion for a C.R.C.P. 56(h) determination of a question of law that the anti-speculation doctrine, *see* section 37–92–103(3), C.R.S. (2005) and *Colo. River Water Conservation Dist. v. Vidler Tunnel Water Co.*, 197 Colo. 413, 417, 594 P.2d 566, 568 (1979), and the "can and will" requirements of section 37–92–305(9)(b), C.R.S. (2005), apply only to new appropriations in proceedings for absolute or conditional water rights and not to change application proceedings.

Objectors Southeastern Colorado Water Conservancy District, Lower Arkansas Valley Water Conservancy District, District 70 Irrigating Canals Association, Amity Mutual Irrigation Company, Carl M. Shinn, Mary Jane Shinn, and Wendy S. Shinn filed a motion for summary judgment, arguing the applications violated the anti-speculation doctrine and presented no specific plan which could be assessed for injury to other water users.

At the time it filed its applications and the water court ruled on the opposers' summary judgment motion, High Plains had no agreements with any persons or entities to place the changed water rights to beneficial use under a change decree in any of the listed twenty-eight counties.

In dismissing the applications, the water court reviewed basic principles relating to water appropriations and change applications, including the necessity for the applicant to identify an actual beneficial use to be made under the sought-for change decree. The water court made the following findings:

Here, the Applicants seek the change for virtually any use where water may be necessary without identifying the specific use and/or end user. Applicants' plan is so expansive and nebulous that it is impossible for other holders of water rights to determine whether they will be injured. Furthermore, there is no discernible method to determine whether the water will be put to a beneficial use.

The water court found that such an application could "easily circumvent the anti-speculation doctrine" and concluded that the doctrine must be applied to the change applications. The court found the applications to be speculative in nature and granted the opposers' summary judgment motion. We affirm dismissal of the applications, for the reasons stated in this opinion.

Reviewing our cases and the applicable statutes, we determine that the anti-speculation doctrine is rooted in the requirement that an appropriation of the public's water resource must be for an actual beneficial use. To implement this requirement, adjudication of water right and change of water right applications includes identification of the

structures through which the appropriated water will be diverted and delivered for identified beneficial uses at identified locations.

## II.

We hold that, in defining "[c]hange of water right" to include "a change in the type, *place,* or time *of use*" and "a change in the point of diversion" in section 37–92–103(5), C.R.S. (2005)(emphasis added), and in defining "appropriation" in section 37–92–103(3)(a), the 1969 Act anticipates, as a basic predicate of an application for a decree changing the type and place of use, that the applicant will sufficiently demonstrate an actual beneficial use to be made at an identified location or locations under the change decree, if issued.

## A. Change of Appropriation's Place of Use

■ Under the 1969 Act, the General Assembly has defined "[c]hange of water right" to include "a change in the type, place, or time of use" and "a change in the point of diversion." § 37–92–103(5), C.R.S. (2005). In construing the provisions of this act, we must effectuate the legislature's intent. *Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.,* 109 P.3d 585, 593 (Colo.2005); *Colo. Ground Water Comm'n v. Eagle Peak Farms, Ltd.,* 919 P.2d 212, 218 (Colo.1996).

■ Colorado water law includes the following principles: (1) all waters within Colorado "belong to the public;" (2) use rights to water may be obtained by public entities and private persons, in accordance with the applicable laws; (3) use rights to waters of a natural stream, including tributary ground water, become "perfected property rights" when the appropriator places the water to an actual beneficial use. *See Chatfield E. Well Co., Ltd. v. Chatfield E. Prop. Owners Ass'n,* 956 P.2d 1260, 1268 (Colo.1998); *New Mercer*

*Ditch Co. v. Armstrong,* 21 Colo. 357, 365–66, 40 P. 989, 992 (1895).

### 1. Situs of the Appropriation

Because they are perfected only by actual use, appropriations of surface water and tributary ground water—whether adjudicated by a conditional, absolute, or change of water right decree—have a situs that includes the point of diversion and the place where the actual beneficial use occurs. *See, e.g., Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 584, 272 P.2d 629, 634 (1954)(Amount of water eligible for a change of use is that amount "reasonably required to be applied to any given tract of land."); *Fields v. Kincaid,* 67 Colo. 20, 23, 184 P. 832, 834 (1919)("A water right can be said to be 'situated' only at the point of diversion or at the place of use")(internal citations omitted); *Farmers' High Line Canal & Reservoir Co. v. Southworth,* 13 Colo. 111, 114–15, 21 P. 1028, 1029 (1889)("[t]o make [a diversion of water into a constitutional appropriation] it must be ... actually applied to the land"); *Thomas v. Guiraud,* 6 Colo. 530, 533 (1883)("[t]he true test of appropriation of water is the successful application thereof to the beneficial use designed").

Encapsulating this long-standing principle of Colorado water law, the 1969 Act provides that " '[w]ater right' means a right to use in accordance with its priority a certain portion of the waters of the state by reason of the appropriation of the same." § 37–92–103(12), C.R.S. (2005). "Appropriation" is the "application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law." § 37–92–103(3)(a), C.R.S. (2005); *see also In re Application for Water Rights in Rio Grande County,* 53 P.3d 1165, 1168 (Colo.2002); *Combs v. Agric. Ditch Co.,* 17 Colo. 146, 150–52, 28 P. 966, 967–68 (1892).[2] "Beneficial

**2.** In *Combs* we considered the operations of a carrier ditch company and were particularly concerned about the possibility of carrier companies tying up large amounts of water for "speculation and monopoly"; accordingly, we held that "the privilege of diversion is granted only for uses truly beneficial, and not for purposes of speculation." 17 Colo. at 152, 28 P. at 968. A carrier ditch company owns title to the decreed appro-

priation, but it must have contract users who place the water to actual beneficial use in order for the appropriation to be obtained and maintained. *City & County of Denver v. Miller,* 149 Colo. 96, 99, 368 P.2d 982, 984 (Colo.1962). Carrier ditches are subject to rate regulation by the board of county commissioners for the service area and users are entitled to continued use of the water, pursuant to the contractual terms of

use" is "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made...." § 37–92–103(4), C.R.S. (2005); *see also Sieber v. Frink,* 7 Colo. 148, 154, 2 P. 901, 904 (1884) (diverter of water entitled to priority for the quantity used beneficially).

These definitions are circular for a singular purpose. They reinforce each other to the end that an appropriator of the public's water resource will put a specific amount of that water to an actual beneficial use at an identified location within Colorado. This is the purpose and presupposition of any decree proceeding, whether for a conditional right, absolute water right, or changed water right.

### 2. Actual Beneficial Use for a Changed Appropriation

■ From the earliest days of its water law, Colorado has recognized that water users have the right to make changes to the terms of their decrees through the adjudication process the General Assembly sets forth. *Strickler v. Colorado Springs,* 16 Colo. 61, 70, 26 P. 313, 316 (1891)(holding that water rights, as property, may be sold and transferred to another type and place of use, so long as the rights of others are not injuriously affected); An Act in Relation to Irrigation, ch. 105, sec. 1, 1899 Colo. Sess. Laws 235 (providing for petition procedure to make changes to decreed water rights).

A change of water right decree recognizes that the priority of the existing right can be operated for new uses at different locations under conditions necessary to maintain the appropriation without injury to other decreed appropriations. Our seminal change of water rights decision, *Strickler,* involved a city's purchase of agricultural water rights for change to municipal uses. 16 Colo. at 68–70, 26 P. at 316. In that case, we established the following points of Colorado water law applicable to changes of water rights: (1) the water resource is the property of the public; (2) the priority of a use right obtained by

irrigating a particular parcel of land is a property right that can be separated from the land; (3) the owner of the use right may sell it to another person or governmental entity; and (4) the courts may decree a change in the point of diversion, type, time, and/or place of beneficial use, subject to no injury of other water rights. *See generally Strickler,* 16 Colo. 61, 26 P. 313; *see also Knowles v. Clear Creek, Platte River & Mill Ditch Co.,* 18 Colo. 209, 210, 32 P. 279, 280 (1893)(holding that one who has acquired the right to divert the waters of a stream may obtain a change to the point of diversion and place of use without losing the water right's priority, where the rights of others are not injuriously affected).

In 1919, the General Assembly required adjudication of all water rights in order to establish their priorities and enforce them. Act of Apr. 9, ch. 147, sec. 2, 1919 Colo. Sess. Laws 487, 488–89. From the water right owner's standpoint, the reason for adjudicating the right is to realize the value and expectations secured through administration of that right's priority; if not adjudicated, the priority will not be enforced. *Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1148–49 (Colo.2001). An express feature of the water law is maximization of as many decreed uses as possible within Colorado's allocation of interstate-apportioned waters. *Id.* at 1150.

The "Colorado Doctrine" arising from the earliest days of its Territorial and Statehood experience established that: (1) water is a public resource, dedicated to beneficial use by public agencies and private persons as prescribed by law; (2) the right to use water includes the right to cross the lands of others so that water can be placed into or withdrawn from natural water-bearing formations or to convey water across others' property; and (3) the natural water-bearing formations may be used for the transport and retention of appropriated water. This new law of custom and usage for promoting the settlement of Colorado established a property-rights-based allocation and administration system

---

their agreements with the company, upon tender of the lawful rate for carriage, and are subject to the reasonable rules of the carrier. *City & Coun-*

*ty of Denver v. Brown,* 56 Colo. 216, 222–24, 138 P. 44, 47 (1914).

that promotes multiple use of a finite resource for beneficial purposes.[3] *See Bd. of County Comm'rs v. Park County Sportsmen's Ranch, LLP*, 45 P.3d 693, 706 (Colo. 2002).

■ To provide the basis for administration by the water officials, and in recognition that different owners may hold the water right over the course of time, water rights are decreed to structures and points of diversion; the priority, location of diversion at the source of supply, and amount of water for application to actual beneficial uses are the essential elements of the water right. *Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 38 (Colo.1997).

■ Actual beneficial use is the basis, measure, and limit of an appropriation. *Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson*, 990 P.2d 46, 54 (Colo.1999). Over an extended period of time a pattern of historic diversions and use under the decreed right at its place of use will mature and become the measure of the appropriation for change purposes. *In re Application for Water Rights of Midway Ranches Prop. Owners Ass'n Inc.*, 938 P.2d 515, 521 (Colo.1997).

■ In a change proceeding, the water court has a duty to ensure that the true right—that which has ripened by beneficial use over time—is the one that continues in its changed form under the new decree. *Santa Fe Trail Ranches*, 990 P.2d at 55. Limitations made applicable to the change of water right by the court's decree advance fundamental principles of Colorado and western water law favoring optimum use, efficient water management, priority administration, and disfavoring speculation and waste. *Id.* at 54.

■ The essential function of the change proceeding is to confirm that a valid appropriation continues in effect under decree provisions that differ from those contained in the prior decree. *Midway Ranches*, 938 P.2d at 521 ("[a]bsolute water rights used in one location may be quantified and changed for use"). When we examine the 1969 Act, we find that the appropriator's interest in the appropriation for an actual beneficial use is a prerequisite for maintaining the application and obtaining a decree.

Section 37–92–103(3)(a)(I), C.R.S. (2005), provides that a purported appropriator must have a "legally vested interest or a reasonable expectation of procuring such interest in the land or facilities to be served by such appropriation, unless such appropriator is a governmental agency or an agent in fact for the persons proposed to be benefited by such appropriation."[4] This requirement is stated as a prohibition contained in the definition of

---

3. The roots of Colorado water law reside in the agrarian, populist efforts of miners and farmers to resist speculative investment that would corner the water resource to the exclusion of actual users settling into the territory and state. In this context, Colorado's adoption of the principle that the public owns the water, its abolition of riparianism (the ownership of water rights by reason of land ownership along the banks of streams), its constitutional limitations on maximum rates that individuals or corporate suppliers can charge for water, the actual beneficial use limitation restricting the amount of water that can be appropriated from the public's water resource, and the right to obtain a right-of-way to construct water facilities across the private lands of another with payment of just compensation, all reflect the anti-monopolistic undergirding of this state's water law. *See* David B. Schorr, *Appropriation as Agrarianism: Distributive Justice in the Creation of Property Rights*, 32 Ecol. L.Q. 3, 33, 41, 55–56 (2005).

4. Section 37–92–103(3)(a), C.R.S. (2005), provides in its entirety as follows:

(3)(a) "Appropriation" means the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law; but no appropriation of water, either absolute or conditional, shall be held to occur when the proposed appropriation is based upon the speculative sale or transfer of the appropriative rights to persons not parties to the proposed appropriation, as evidenced by either of the following:

(I) The purported appropriator of record does not have either a legally vested interest or a reasonable expectation of procuring such interest in the lands or facilities to be served by such appropriation, unless such appropriator is a governmental agency or an agent in fact for the persons proposed to be benefited by such appropriation.

(II) The purported appropriator of record does not have a specific plan and intent to divert, store, or otherwise capture, possess, and control a specific quantity of water for specific beneficial uses.

"[a]ppropriation." The water court may not enter a decree for either a "conditional" or "absolute" water right unless the appropriator possesses the requisite interest in the lands or facilities to be served by the appropriation. § 37–92–103(3)(a)–(a)(I), C.R.S. (2005). Section 37–92–103(3)(a)(II) provides that the purported appropriator of record must have "a specific plan and intent to . . . capture, possess and control a specific quantity of water for specific beneficial uses."

These strictures implement the appropriation and beneficial use requirements of Article XVI, sections 5 and 6 of the Colorado Constitution, which provide that the public's water resource is "dedicated to the use of the people of the state, subject to appropriation as hereinafter provided" and "[t]he right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied."

The subject of a change decree proceeding is a conditional or an absolute water right. As shown by *Strickler* and our subsequent change cases, the status of the appropriation and the appropriator are subject to identification, examination, and verification in the change proceeding. Priority of appropriation for beneficial use is the foundation upon which the exercise of decreed water rights in their original or changed form depends in Colorado. Under the statutes and the case law, the appropriator or the appropriator's agent appears for the purpose of demonstrating the actual historical beneficial use of an absolute water right and the appropriation's new actual beneficial uses. *See, Santa Fe Trail Ranches,* 990 P.2d at 54–55.

■■■ Section 37–92–103(3)(a)(I) and (II) apply in a change in type and place of use proceeding because the absolute decree for a water right is reopened by virtue of a change application, *see Ready Mixed Concrete Co. in Adams County v. Farmers Reservoir & Irrigation Co.,* 115 P.3d 638, 645–46 (Colo.2005), and the contemplated result is operation of the absolute appropriation under changed conditions pursuant to a new decree. § 37–92–103(3)(a)(II), C.R.S. (2005); *see Santa Fe Trail Ranches,* 990 P.2d at 54–55. Accordingly, the change applicant must show a legally vested interest in the land to be served by the change of use and a specific plan and intent to use the water for specific purposes. This statutory requirement can be satisfied by a showing that the appropriator of record for purposes of the change decree is a governmental agency, or a person who will use the changed water right for his or her own lands or business or has an agreement to provide water to a public entity and/or private lands or businesses to be served by the changed water right. § 37–92–103(3)(a)(I), C.R.S. (2005).

Our cases concerning the anti-speculation doctrine do not disapprove of water development or private investment in water projects; rather, they re-emphasize our traditional requirement that appropriated water is applied to actual beneficial use. *See, e.g., Colo. Ground Water Comm'n v. N. Kiowa–Bijou Groundwater Mgmt. Dist.,* 77 P.3d 62, 78–80 (Colo.2003) (requiring evidence of identifiable place and manner of use in applications for withdrawal of designated groundwater); *Lionelle v. Se. Colo. Water Conservancy Dist.,* 676 P.2d 1162, 1169 (Colo.1984)(finding insufficient evidence of future needs and uses of the water to show intent to appropriate in application for conditional enlargement of storage right); *Vidler Tunnel,* 594 P.2d at 568 (stating that "the right to appropriate is for *use,* not merely for profit")(emphasis in original).

■■■ As our cases repeatedly demonstrate, each water right has a situs identified by the point of the diversion and the place to which the water is delivered for actual beneficial use. A water right requires both an appropriator and a place where the appropriation is put to actual beneficial use. Accordingly, a change decree recognizes a new situs for the appropriation. In defining "[c]hange of water right" to include "a change in the type, place, or time of use" and "a change in the point of diversion," § 37–92–103(5), C.R.S. (2005), and in defining "appropriation" in section 37–92–103(3)(a)(I) and (II), the 1969 Act anticipates, as a basic predicate of an application for a decree changing the place of use, that there is a sufficiently described actual beneficial use to be made at an

identified location or locations under the change decree.[5]

## B. High Plains's Change Applications

 High Plains has applied for a change of water right so that it can make use of various different points of diversion and storage and can put the water to use in any number of Front Range locations for any number of purposes. The specifically-listed types of uses all appear to be components of municipal use, yet the application does not identify any particular municipal or quasi-municipal entity with which High Plains has an agreement for actual beneficial use of the water sought to be transferred. Nor does High Plains identify any parcels of private land, businesses, or a service area for specific consumers of the water to be served under the change decree.

There is a critical difference between High Plains's change application and the changes approved by water courts addressed in our prior decisions involving type and place of use changes from agricultural to municipal. In *Strickler*, where we first approved a change of farm water rights to a city, the party requesting the change was the municipality itself, Colorado Springs. *See generally*, 16 Colo. 61, 26 P. 313. Likewise, in *Farmers Highline Canal*, the City of Golden applied to change agricultural water rights that it had purchased to municipal uses. 129 Colo. 575, 272 P.2d 629. In *Bijou*, the City of Thornton applied to change water rights it purchased. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1 (Colo.1996).

In this case, High Plains asserts that it has had some "discussions" with "water users" in fourteen of the twenty-eight counties listed in the applications, but admits that it has "not entered any contracts for use, other than irrigation" of the water rights it owns or controls. Although counsel opined at oral argument that the water might be used in El Paso and Douglas counties due to population growth and waning aquifers there, no water user or potential water user in those or any other counties stepped forward by the time of the change applications to subscribe for raw or retail water supply service from High Plains, should it obtain the change decree.

 The purpose of a change of water right is to obtain a revised decree that recognizes continuation of the right to divert the water at different points, for different uses, and/or different places of actual beneficial use. A guess that a transferred priority might eventually be put to beneficial use is not what the Colorado Constitution or the General Assembly envisioned as the triggering predicate for continuing an appropriation under a change of water right decree. The change application process is intended to facilitate transfers that are calculated to result in a continued application of the appropriated water to specified beneficial uses at different identified locations from the current decree under conditions to prevent injury to other water rights.

The transfer of senior priorities to other uses and locations is a very important feature of Colorado water law.[6] In view of the

---

5. To help implement these requirements, the form application utilized in Colorado water courts for a change of water right calls for description of the location and proposed plan of operation for the changed appropriation. *See* Form JDF 299W, "Application for Change of Water Right," ¶ 4 ("Proposed change: (a) describe change requested: alternate point of diversion/replacement/change of use; (if well, please list pertinent information from well permit) (b) location; (c) use; (d) amount; (e) give proposed plan for operation (if (b) through (e) applicable, please give full descriptions.)"), *available at* http://www.courts.state.co.us/chs/court/forms/waterforms/jdf299w.pdf.

6. Despite the importance of marketability of water rights, water use rights are not traditionally treated as if they were simply a commodity:
 The situation involving water is very unusual, and it applies to virtually nothing else. For purposes of interstate commerce, for example, all other state resources may be privatized fully, and freely shipped away from the area of origin as ordinary commodities—even though states have often tried to keep such resources within their own boundaries to benefit their own residents. Such efforts have routinely and repeatedly been held unconstitutional by the courts. The only other common example where things are treated like water—that is, as community resources and not as ordinary salable commodities—arises with cultural proper-

overappropriated status of three of its four major rivers, this state's future well-being likely depends on continued transfers of appropriated agricultural water to other uses at other places.[7] Colorado has grown from two million residents in 1970 to 4.6 million today, with an additional 2.5 million expected by 2030. *Draft Population Forecasts by Region, 2000–2030,* Colorado Dep't of Local Affairs, at http://dola.colo rado.gov/demog/Population/PopulationTotals/Forec asts/Substate.pdf.[8] Much of this growth has been made possible by a steady change of water rights from agriculture to municipal use that started one-hundred-fifteen years ago with *Strickler.*[9]

Nevertheless, the General Assembly did not intend that courts and potential opposers be burdened with change applications premised on conjecture. Change proceedings can be extremely expensive to participants and consume many days of trial and appeal time—taking away from the courts' attention to other needs of the citizens of Colorado. The highly complex change proceeding in the *Bijou* case is one example. *See generally,* 926 P.2d 1. There, to demonstrate where the appropriations would be used, the City of Thornton presented extensive evidence to support its future water demand within its future boundaries or service areas. *Id.* at 40.

High Plains argues that it is prejudiced by dismissal of its applications because of risk to its investment and because it cannot enter into contracts with end users until it has court approval to change the water rights. This argument reverses the well-established methodology for change of type and place of use proceedings. As an initial matter, High Plains's investment so far has been primarily for the purposes of acquiring FLCC shares that are decreed for irrigation use on lands under the FLCC system. Purchase of shares in a mutual ditch company guarantee only a proportionate interest in the water rights held by the mutual company and continued delivery of the water to their historic place of use, upon payment of the assessments imposed. *See Brown,* 56 Colo. at 222, 138 P. at 46–47.

Applicants for a change of water right must expect full scrutiny of their applications by opposers and compliance with applicable procedures and substantive laws. *See generally* §§ 37–92–301, 302, C.R.S. (2005); *see also Ready Mixed Concrete,* 115 P.3d at 645–46. To allow High Plains to pursue its application for the change decree it seeks, in the absence of identifying the location or locations for actual beneficial use to be made under the change decree, would be to treat that company differently from all other change applicants. This we will not do.

Our decision in this regard does not prejudice the ability of investors such as High Plains to realize reasonable expectations on their investments. First, High Plains can use the shares it acquired on lands under the FLCC system, to the benefit of the local

ties, antiquities for example, where the nation of origin often asserts a national claim on the property in order to prevent exports.
Joseph L. Sax, *Understanding Transfers: Community Rights and the Privatization of Water,* 1 West–N.W. 13, 14 (1994)(internal citations omitted).

7. *See* Lawrence J. MacDonnell & Teresa A. Rice, *Moving Agricultural Water to Cities: The Search for Smarter Approaches,* 2 Hastings W.-N.W. J. Envtl. L. & Pol'y 27, 27 (1994)("Urban water needs are the primary source of new demand for out-of-stream water use in the West today.").

8. In its findings resulting from the Statewide Water Supply Initiative, the Colorado Water Conservation Board projects an approximate twenty percent shortfall in supply to meet water requirements by the year 2030 across the state that may need to be filled by temporary or permanent agricultural transfers of water; this assumes that presently contemplated projects of local government water suppliers are actually built. Colorado Water Conservation Board, *Statewide Water Supply Initiative Report Overview* 4 (Dec.2004).

9. For a review and description of some prior permanent water right transfers along Colorado's Front Range, see National Research Council, *Water Transfers in the West: Efficiency, Equity, and the Environment* 137–61 (1992). Municipal entities lying within the Arkansas River Basin, including the cities of Colorado Springs, Pueblo, and Pueblo West, have been active in acquiring and changing Arkansas Basin agricultural water rights for their use. The City of Aurora, which is located in the South Platte River Basin, has also acquired water rights in the Arkansas River Basin for its use. *Id.* at 150–51.

economy and to consumers of agricultural products.

Second, we have held that a sufficient ditch-wide historic consumptive use analysis in a change of water right case can be utilized in another change case for allocation of the amount of water to which the mutual company shareholder is entitled. *Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co.*, 33 P.3d 799, 807 (Colo.2001) (also recognizing parcel-by-parcel methodology); *see also Williams v. Midway Ranches Property Assoc.*, 938 P.2d 515, 521, 525 (Colo. 1997). Appropriate implementation of claim and issue preclusion prevents expensive relitigation of historic consumptive use in transfer after transfer involving the same ditch or reservoir system. *Farmers High Line Canal v. City of Golden*, 975 P.2d 189, 200-01 (Colo. 1999).

Third, our jurisprudence shows that applicants have been required to specify with reasonable particularity where the transferred water is going to be put to beneficial use. The cases we have considered for change in the place of use under the 1969 Act have included a specific proposal for the new place of use. *See, e.g., Santa Fe Trail Ranches*, 990 P.2d 46 (developer applies to change manufacturing water rights to a variety of uses in housing subdivision); *Bijou*, 926 P.2d 1 (city applies to change place of use to its own municipal operations); *Matter of May*, 756 P.2d 362 (Colo.1988) (corporation applies to use irrigation rights to supply its pending subdivision on former ranch lands); *Se. Colo. Water Conservancy Dist. v. Fort Lyon Canal Co.*, 720 P.2d 133 (Colo.1986)(canal company and Colorado Division of Wildlife apply to change storage rights to creation of wildlife and recreation area in existing John Martin Reservoir); *In re Application for Water Rights of Certain S'holders in the Las Animas Consol. Canal Co.*, 688 P.2d 1102 (Colo.1984)(public utility company applies to change historic irrigation rights to energy-production at its proposed new plant); *Great W. Sugar Co. v. Jackson Lake Reservoir & Irrigation Co.*, 681 P.2d 484 (Colo.1984)(company proposes augmentation plan to cover its changed place of use from original factories to certain other, identified, existing factories); *Ackerman v. City of Walsenburg*, 171 Colo. 304, 467 P.2d 267 (1970)(city applies to change storage right used for irrigation to its own municipal uses); *see also Danielson v. Kerbs Agric., Inc.*, 646 P.2d 363, 372 (Colo.1982)(groundwater user must go through change application proceedings to apply historic amount of water to acreage not included in original decree).

■■■■■ Fourth, mutual ditch and reservoir company shares are valuable assets. A mutual ditch company is a non-profit entity organized to deliver water to its shareholders. *City of Westminster v. City of Broomfield*, 769 P.2d 490, 492 (Colo.1989). Each of the shareholders owns "a definite and specific water right, as well as a corresponding interest in the ditch, canal, reservoir, and other works by which the water right is utilized." *Jacobucci v. Dist. Court*, 189 Colo. 380, 387–88, 541 P.2d 667, 672 (1975).[10] Mutual ditch company water rights are particularly valuable if they have senior priorities, in light of the over-appropriated status of the South Platte, Arkansas, and Rio Grande river systems. *See Ready Mixed Concrete*, 115 P.3d at 644 ("[P]ractically every decree on the South Platte River, except possibly only the very early ones, is dependent for its supply, and for years and years has been, upon return, waste and seepage waters.") (internal quotations omitted); *Empire Lodge*, 39 P.3d at 1144 n.3 ("[T]he natural surface water and groundwater system of the Arkansas River is severely over-appropriated."); *In re Rules & Regulations Governing the Use, Control, & Protection of Water Rights*, 674 P.2d 914, 931 (Colo.1983)(stating that the Rio Grande system and all streams in the San Luis Valley have long been over-appropriated.") Therefore, investors are not in danger of losing value in their mutual compa-

10. Mutual ditch companies are solely in the business of storing and transporting water to and for their shareholders, conditioned on the payment of annual assessments levied to cover the operating expenses of the company. *Nelson v. Lake Canal Co. of Colo.*, 644 P.2d 55, 57–58 (Colo.App. 1981). Shareholders in a mutual ditch company are, by virtue of their share ownership, the owners of the water works and appropriations. *Id.* at 58.

ny shares any more than any other shareholder who is also subject to prevailing economic conditions.

Fifth, we recognize that Colorado law provides for changing the terms of decreed water rights in accordance with the applicable procedures. Since the inception of statehood and the prompt adoption of the first water rights adjudication acts, *see* Act of February 19, section 1, 1879 Colo. Sess. Laws 94 and Act of February 23, section 1, 1881 Colo. Sess. Laws 142, 142–43, we have held that appropriations may be decreed for diversion from one basin for actual beneficial use at a location in another basin. *Coffin v. Left Hand Ditch Co.*, 6 Colo. 443, 446 (1882).

Sixth, the General Assembly has consistently shown its interest in providing both security and flexibility in the administration of water, most recently by adopting statutes that allow owners of agricultural water rights to temporarily lease and market their water without a court adjudication and a change decree. *See, e.g.,* § 37–92–309, C.R.S. (2005)(providing for interruptible water supply agreements between two or more decreed water users when approved by the state engineer). *See ISG, LLC v. Ark. Valley Ditch Assoc.*, No. 04SA268, 120 P.3d 724, 2005 WL 2203234 (Colo. Sept.12, 2005). This provision reiterates the General Assembly's explicit understanding that all agricultural water transfers, whether temporary or permanent, require identification of the particular location where the beneficial use will actually occur. § 37–92–309(3)(stating that "[s]tate engineer is authorized to approve and administer interruptible water supply agreements that permit a temporary change in the point of diversion, *location of use,* and type of use of an absolute water right without the need for an adjudication pursuant to this article. . . .")(emphasis added).[11]

It is possible that High Plains harbored unrealistic expectations when it purchased such a large interest in FLCC. The water

court's concern about the "nebulous and expansive" nature and scope of the High Plains application undoubtedly stems from ambiguity about whom the requested change decree is going to serve, when, how, and in what capacity—ranging from simple resale of some or all of the shares over time to providing raw or retail water service to others. In any event, High Plains's applications for a change in the type and place of use are premature in the absence of identified places of actual beneficial use for operation of the change decree. As we said in *Combs*, a stockholder in an irrigating company "can only transfer his priority to some one who will continue to use the water." 17 Colo. at 152, 28 P. at 968. Without prejudice to consideration of future applications for change of water rights associated with shares of FLCC High Plains now owns, we uphold the trial court's order dismissing the applications in this case.

### III.

Accordingly, we affirm the water court's judgment.

---

**11.** High Plains resists dismissal of its applications by arguing that it is entitled, at least, to a court consumptive use determination in order to ascertain the amount of water it may use for augmentation and replacement under the water banking statute, section 37-80.5-104.5(1) (c), C.R.S. (2005). We disagree. For purposes of this statute and the Arkansas River Water Bank Pilot Program rules, the State Engineer determines the allowable quantity of consumptive use in connection with participation in the program. In particular, Rule 8 provides the administrative mechanism for calculating historic consumptive use for purposes of the water banking program.